## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SIERRA CLUB, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No.  04-2012 (JDB)** |
| **FRAN MAINELLA, Director of the National Park Service, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiffs challenge three related actions by the National Park Service ("NPS") that implement the provisions of 36 C.F.R. Part 9, Subpart B ("9B Regulations") governing private oil and gas drilling operations within units of the National Park System.  Plaintiffs contend that defendants have acted in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., and the National Park Service Organic Act, 16 U.S.C. § 1, by taking actions that allegedly mandate and implement a new approach limiting NPS's authority to regulate "directional" oil and gas drilling -- that is, the practice of drilling at a slant adjacent to and outside of Park boundaries to extract privately owned oil and gas beneath the Park unit surface.  The challenged actions consist of a guidance document issued in November 2003 discussing the criteria for obtaining an exemption from the 9B Regulations, and two site-specific NPS actions granting exemptions and finding no significant impact on the environment under NEPA.

Defendants move to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that plaintiffs lack standing and there is no final agency action

before the Court.[1]  For the reasons explained below, the motion to dismiss is granted in part and

denied in part.

## BACKGROUND

### I.      Statutory and Regulatory Background

The Organic Act is the general authorizing statute for the National Park Service.  It

provides that:

> There is created in the Department of the Interior a service to be called the National Park
> Service . . . .  The service thus established shall promote and regulate the use of the . . .
> national parks . . . by such means and measures as conform to the fundamental purpose of
> the said parks  . . . which purpose is to conserve the scenery and the natural and historic
> objects and the wild life therein and to provide for the enjoyment of the same in such
> manner and by such means as will leave them unimpaired for the enjoyment of future
> generations.

16 U.S.C. § 1.  The Secretary of the Interior shall issue "such rules and regulations as he may

deem necessary or proper for the use and management of the parks . . . under the jurisdiction of

the National Park Service."[2]  Id. § 3.   Because the Organic Act is silent as to the specifics of park

management, the Secretary has broad discretion on how to implement the statute.  Davis v.

Latschar, 202 F.3d 359, 365 (D.C. Cir. 2000).   In furtherance of its responsibilities under the

Organic Act, NPS also periodically issues a "Management Policies" document "designed  to

---

[1]  For ease of reference, the Court will refer to defendants' memorandum in support of its
motion to dismiss as "Defs.' Mem." and plaintiffs' memorandum in support of its opposition
thereto as "Pls.' Mem."  The exhibits attached to each memorandum are referred to as "Defs.'
Ex." and "Pls.' Ex."

[2]  The enabling legislation creating the Big Thicket National Preserve in Texas -- the Park
unit affected by the directional drilling exemptions at issue here -- similarly provides that "[s]uch
lands shall be administered by the Secretary as a unit of the National Park System in a manner
which will assure their natural and ecological integrity in perpetuity in accordance with the
provisions of sections 698 to 698e of this title and with the provisions of sections 1 and 2 to 4 of
this title [the Organic Act]."  16 U.S.C. § 698c(a).

provide NPS management and staff with . . . updated information on NPS policy and required

and/or recommended actions." See 2001 Management Policies at 6 (Defs.' Ex. 6).

The NPS promulgated the 9B Regulations in 1978 to address the exercise of rights to oil

and gas owned by private entities where access is on, across, or through federally owned or

controlled land or waters. See 36 C.F.R. § 9.30(a). Such rights arise most frequently where the

land within a Park unit is owned in fee by a private party, including the right to oil and gas, or,

most relevant here, "[w]hen in a transfer of the surface estate to the United States, the grantor

reserved the rights to the oil and gas." Id. The regulations generally prohibit the granting of

access through federal lands or waters unless the operator has an approved "plan of operations,"

which "serves as the operator's access permit" and sets forth information regarding, inter alia, the

various "environments to be affected by operations" and "steps to be taken . . . to mitigate any

adverse environmental effects." Id. §§ 9.32(a), 9.36(a)(16). Operators subject to the 9B

Regulations also must take "all technologically feasible precautions" to prevent a well from

blowing open or becoming wild and to prevent accidents and fires. Id. §§ 9.44, 9.46. Any

operator outside the boundaries of a Park unit must comply with these requirements if he is using

directional drilling techniques which result in the drill hole crossing into the unit and passing

under any federal land or water. Id. § 9.32(e). However, an exemption is available where "the

Regional Director is able to determine from available data, that such operations pose no

significant threat of damage to park resources, both surface and subsurface, resulting from

surface subsidence, fracture of geological formations with resultant fresh water acquifer

contamination, or natural gas escape, or the like." Id.

NEPA requires a federal agency to prepare an environmental impact statement ("EIS") for all "proposals for . . . major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  The EIS must include, among other things, "a detailed statement describing the reasonably foreseeable environmental impact both of the proposed federal action and of any feasible alternative(s) to the proposed federal action." Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43, 49 (D.C. Cir. 1999) (internal quotations omitted). An EIS is not required if the agency makes a determination based on an "environmental assessment" that the proposed action would not have a significant impact on the environment.  40 C.F.R. §§ 1501.4, 1501.8, and 1508.13.  The Supreme Court has explained that "it is now well-settled that NEPA itself does not mandate particular results, but simply describes the necessary process." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  Thus, "NEPA merely prohibits uninformed -- rather than unwise -- agency action." Id. at 351.

## II.    Factual Background

The following facts are taken from plaintiffs' amended complaint and the documents quoted therein, which plaintiffs have, as a practical matter, incorporated by reference.  Private entities hold title to subsurface minerals at more than a dozen Park units.  In February 1992, the Park Service issued a document entitled "NPS Procedures Governing Nonfederal Oil and Gas Rights" implementing the 9B Regulations ("1992 9B Procedures").  Defs.' Ex. 3.  Plaintiffs characterize this document as containing a section entitled "Potential Threats to Park Resources and Values from Directional Drilling Operations Outside a NPS Unit," which mandates consideration of certain types of threats when reviewing an application for a § 9.32(e) exemption.  Am. Compl. ¶ 31.  Such potential threats include those caused by "downhole" operations -- that

is, the actual subsurface drilling occurring within Park boundaries -- and by the drilling activity

outside of the Park unit, including water and soil contamination from the surface well pad; soil

erosion and surface runoff from access roads and the well pad; nuisance or safety hazards from

gases; fire hazards from equipment at the well pad; and air pollution from extraction equipment,

transport vehicles, and gas leaks at the well pad.  Id.  The scope of this mandated assessment is

consistent with the NPS Management Policies issued through notice and comment rulemaking in

2001, which provide that NPS may need to carry out "[s]trategies and actions beyond Park

boundaries" in order to protect park resources.  Id. ¶ 32 (quoting 2001 Management Policies at

§§ 1.5, 3.1).

Mr. Ross Davis of Davis Brothers Oil Producers, Inc., contacted NPS Director Fran

Mainella and other NPS officials on October 31, 2001, regarding his company's application for

directional drilling at Big Thicket National Preserve, asserting that NPS lacked jurisdiction to

regulate the surface location of the proposed well because it was outside of Big Thicket's

boundaries.  ¶ Id. ¶ 33.  On December 20, 2001, a Park Service official responded to Davis's

letter, stating that NPS would "streamline the process" for "all future drilling applications under

§ 9.32(e) . . . ."  Id. ¶ 34.

On May 21, 2003, NPS issued a document without notice and comment entitled

"Implementation of the Directional Drilling Provision of NPS Nonfederal Oil and Gas

Regulations at 36 CFR 9B" (hereinafter "May 2003 Directive").  The document stated that:

> [NPS] jurisdiction under these regulations does not extend to any activities occurring
> outside park boundaries, even if such activities are associated with a nonfederal oil and
> gas operation occurring inside a park . . . . Section 9.32(e) . . . is limited in scope to those
> aspects of the directional drilling operation occurring within park boundaries.  As
> promulgated, it does not provide a means for the NPS to assert regulatory authority under

the 9B regulations over surface and subsurface operations occurring outside park boundaries.

Id. at 1 (Defs.' Ex. 2).  The Directive highlighted the use of the term "operations" in § 9.32(e) and noted the limitation in the definition of "operations" to "all functions, work and activities within a unit."  Id. at 2 (emphasis in original).  It thus concluded that "[t]he potential impacts considered [in making an exemption determination] relate only to effects on park resources from downhole activities occurring within the boundary of the park, not threats to park resources associated with the operation outside park boundaries."  Id. at 1, 2 (quoted in Am. Compl. ¶ 35).

NPS issued the "Final Guidance on Implementing the Directional Drilling Provision of the Service's Nonfederal Oil and Gas Regulations at 36 CFR 9B" ("2003 Guidance") on November 13, 2003.  Defs.' Ex. 4A-4B.  The 2003 Guidance reiterates the § 9.32(e) exemption process as described in the May 2003 Directive, and "describes [NPS] compliance responsibilities in evaluating a request for an exemption" with regard to NEPA and other environmental statutes.  Am. Compl. ¶ 36; 2003 Guidance at 6-10.  The 2003 Guidance was issued without public notice or opportunity for public comment, and was not the subject of an environmental review under NEPA.  Am. Compl. ¶¶ 38, 39.

Since that time, NPS has approved several requests for exemption pursuant to § 9.32(e).  Id. ¶ 42.  In August 2004, NPS issued an environmental assessment ("EA") for a proposal by Comstock Oil and Gas, Inc. ("Comstock") to directionally drill and produce a well below the Big Sandy Creek Unit of Big Thicket, from a surface location 300 feet from the Unit, utilizing a wellpad extending within 100 feet from the Unit boundary.  Id. & Pls.' Ex. 2.  Consistent with the 2003 Guidance, the EA states that "potential impacts considered in the § 9.32(e) exemption process relate only to effects on park resources from downhole activities [and] not threats to park

resources associated with the operation outside park boundaries." Am. Compl. ¶ 43 (quoting EA at 6). In the public comment process, plaintiffs commented that the exemption analysis improperly excluded consideration of threats from surface operations outside of Unit boundaries, and submitted that the EA must set forth alternatives beyond the no-action alternative proposed, as well as a more comprehensive evaluation of the impacts of the proposed operation.  Id. ¶ 44. Without considering the impact of the nearby surface operations, NPS issued a "finding of no significant impact" ("FONSI") under NEPA, which also concluded that Comstock qualified for the § 9.32(e) exemption relying on language from the 2003 Guidance.  Id. ¶ 45.

Another Comstock directional drilling proposal at the Big Sandy Creek Unit was the subject of a separate EA in September 2004.  Id. ¶ 47 & Pls.' Ex. 1.  This well would also have a surface location 300 feet from the Unit, utilizing a wellpad extending within 100 feet from the Unit boundary.  Am. Compl. ¶ 47.  NPS applied substantially the same approach as with the first Comstock action in its § 9.32(e) exemption analysis, excluding consideration of the threats to park resources from surface operations outside of the Unit, and issued a FONSI determination that also granted this second exemption on November 4, 2004.  Id. ¶¶ 48-49.

Plaintiffs' amended complaint raises three claims for relief.  First, they assert that NPS acted in violation of the APA by issuing the 2003 Guidance, and by applying the Guidance in the Comstock determinations, without providing public notice and an opportunity for public comment and, furthermore, that such actions were arbitrary and capricious.  Plaintiffs next contend that NPS acted contrary to the Organic Act and NPS Management Policies in violation of the APA because the Guidance abandons a long-standing regulatory process requiring a demonstration of no impairment of park wildlife and resources.  They point to the Comstock

determinations as specific actions that failed to consider such impacts from surface activities. Plaintiff's last claim for relief alleges that NPS acted contrary to NEPA in violation of the APA by issuing the 2003 Guidance without conducting a NEPA environmental review and by issuing the Comstock determinations without considering whether surface activities pose a threat to Park resources.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction.  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); see also Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 18 (D.D.C. 1998).  Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), see Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, (1993), the court need not accept legal conclusions as true,  Boyd v. O'Neill, 273 F. Supp. 2d 92, 95 (D.D.C. 2003).  Furthermore, "'plaintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350).  Additionally, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case.  See Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n. 3 (D.C. Cir. 1997); Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986).  Thus, "where

necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record." Coalition for Underground Expansion, 333 F.3d at 198 (quoting Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir.1992)).  Accordingly, an independent inquiry may be undertaken by the court to assure itself of its own subject matter jurisdiction without triggering unnecessary discovery or converting the motion to one for summary judgment pursuant to Fed. R. Civ. P. 56.  Haase v. Sessions, 835 F.2d 902, 907-08 (D.C. Cir. 1987).[3]

A motion to dismiss for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief."  Kowal v. MCI Commun. Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); Beverly Enters., Inc. v. Herman, 50 F. Supp. 2d 7, 11 (D.D.C. 1999).  At the stage of litigation when dismissal is sought, a plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts.  See St. Francis Xavier Parochial Sch., 117 F.3d at 624.

---

[3]  Several of these cases also hold that a court may resolve disputed jurisdictional facts on a Rule 12(b)(1) motion to dismiss.  Coalition for Underground Expansion, 333 F.3d at 198; Herbert, 974 F.2d at 197; Haase, 835 F.2d at 907; accord Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  Another recent case, Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005), however, holds that a court's ability to look to extra-pleading materials does not include the authority to resolve disputed facts.  Id. ("the district court may consider materials outside the pleadings when deciding a motion to dismiss for lack of jurisdiction, but it must still accept all of the factual allegations in the complaint as true").  Although citing Herbert, Jerome did not address the extensive discussion in Herbert (and other cases) regarding the authority of the trial court to resolve disputed jurisdictional facts, as long as any necessary procedural protections, such as discovery or an evidentiary hearing, are provided to the plaintiff.  Herbert 974 F.3d at 197.  Accordingly, the Court concludes that the law in this Circuit continues to authorize the resolution of disputed jurisdictional facts.  The Court finds it unnecessary to resolve any factual disputes to resolve the pending motion, but notes that to the extent plaintiffs' recitation of the documents at issue -- the 2003 Guidance and 1992 9B Procedures -- conflicts with the documents themselves, the Court relies on the documents.  Such a "factual resolution," of course, requires no discovery or evidentiary hearing.

**DISCUSSION**

I.    **Standing**

Defendants contend that the Court lacks subject matter jurisdiction over this matter on the ground that plaintiffs lack injury sufficient to establish standing.  Plaintiffs respond that the amended complaint sufficiently alleges how the procedural violations under the APA and NEPA harm their aesthetic and recreational interests in Big Thicket and other parks, as well as cause a demonstrable increased risk of environmental damage to those parks.[4]

It is well-settled that there are three minimum elements necessary to establish standing:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and footnote omitted);

accord Center for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005).[5]

---

[4]  Plaintiffs' amended complaint also alleges informational injury flowing from the procedural violations of NEPA and the APA.  However, plaintiffs emphasized at the motions hearing, and in their supplemental briefing, that they rely primarily on their allegations of aesthetic harm to establish standing.  Tr. at 68.  In light of the Court's conclusion that plaintiffs have standing based on the aesthetic injuries described above, the Court finds it unnecessary to address the issue of informational injury.

[5]  An association has representational standing if:  (1) at least one of its members has standing to sue in his or her own right; (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.  American Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005).   In this case, the Court finds no reason to doubt that plaintiffs satisfy the latter two requirements of the associational standing test, and defendants do not contend

(continued...)

Plaintiffs assert that their amended complaint satisfies the first element -- injury-in-fact -- through the following allegations.  Plaintiffs and their members regularly use and enjoy Big Thicket and other parks where the 2003 Guidance applies to directional drilling, including the areas in close proximity to the Comstock sites.  Am. Compl. ¶¶ 4, 7, 9, 12.  Plaintiffs further allege that defendants' actions are injuring plaintiffs' experiences by allowing oil and gas drilling to occur in immediate proximity to the Parks and that those actions are "increasing the likelihood that oil and gas development will result in the destruction of wildlife, habitat, and other natural resources in the National Park System enjoyed by Sierra Club members."  Id. ¶ 5; see also ¶¶ 9, 10, 13.

While plaintiffs believe the factual allegations in their amended complaint are sufficient by themselves to establish standing, they also have submitted the declaration of Brandt Mannchen, a member of plaintiff Sierra Club and an individually-named plaintiff in this case. He describes the injury to his aesthetic and recreational interests, and the increased risk of environmental harm, as follows:

> 3.   . . . [The Comstock] decisions harm my aesthetic and recreational enjoyment of Big Thicket and the surrounding areas, because the NPS is failing to consider impacts to Big Thicket from directional drilling surface activities immediately adjacent to the Preserve due to the NPS's new 2003 Guidance on oil and gas drilling.  As a result, the NPS is not fulfilling its duty to prevent the impairment of Park resources by, for example, requiring the imposition of mitigation measures or the development of a plan of operations to protect the Preserve.

> 4.   My recreational and aesthetic enjoyment of Big Thicket, and nearby areas, is harmed by these failures in several ways.  Because the risk of oil spills, fires, or otherwise "wild" wells and their damaging effects on the environment are no longer accounted for

---

[5](...continued)
otherwise.  Therefore, the focus of the standing inquiry is on whether at least one of plaintiffs' members has individual standing to sue.

in permitting directional drilling operations in close proximity to Big Thicket, <u>there is a markedly increased chance that one of these disasters will come to pass</u>. . . .

5.      . . . [O]perations that increase noise levels in the Preserve impact my ability to watch birds and other animals that disperse as a result of increased noise, my opportunity to enjoy the natural sounds, and my ability to enjoy solitude and quiet in the Preserve. Other aspects of these surface operations that NPS no longer considers include potential increases in air pollution, introduction of exotic plant species, and the general diminishment of the biodiversity of Big Thicket from which I derive great aesthetic enjoyment.

Mannchen Decl. ¶¶ 3-5 (Pls.' Ex. 3) (emphasis added).

Defendants contend that the increased risks of environmental harm averred in the complaint and declaration amount only to speculation about a hypothetical risk of harm insufficient to establish injury-in-fact under <u>Florida Audubon Soc'y v. Bentsen</u>, 94 F.3d 658 (D.C. Cir. 1996) (en banc).  In that case, the court of appeals held that, to demonstrate injury sufficient for standing in a procedural rights case, such as NEPA and APA cases, the plaintiff must show that the omission or insufficiency of the procedure has "demonstrably increased [the] risk of serious environmental harm" that "actually threatens the plaintiff's particular interests." <u>Id.</u> at 667; <u>see also</u> <u>Commonwealth of Massachusetts v. EPA</u>, 415 F.3d 50, 60 (D.C. Cir. 2005) (Sentelle, J., concurring) (applying "demonstrably increased risk" standard in cases outside of NEPA).  Moreover, on the causation prong, "a procedural-rights plaintiff must show . . . that it is <u>substantially probable</u> that the procedural breach will cause the essential injury to the plaintiff's own interest." <u>Florida Audubon Soc'y</u>, 94 F.3d at 664-65.  Thus, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." <u>Id.</u> at 664.

The Court will consider both the allegations of the amended complaint and the Mannchen declaration in conducting the standing inquiry.  Plaintiffs correctly note that the extent of plaintiffs' burden to demonstrate standing varies with the procedural context of the case, and thus, "[a]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice,' for on a motion to dismiss, the court presumes that general allegations embrace the specific facts that are necessary to support the claim."  Defenders of Wildlife, 504 U.S. at 561 (quoted in Sierra Club v. EPA, 292 F.3d 895, 898-99 (D.C. Cir. 2002)).  However, as discussed above, see supra at 8-9, this general principle is not inconsistent with a court inquiring into the proper exercise of its jurisdiction, including reviewing evidence outside of the complaint, so long as any necessary procedural protections are provided to the plaintiff.  See Coalition for Underground Expansion, 333 F.3d at 198 (rejecting plaintiff's claim that court's consideration of declaration to determine standing was inappropriate, relying on Herbert for the principle that "where necessary, the court may consider the complaint supplemented by undisputed facts" evidenced in the record).

Here, the only materials the Court relies on to determine standing are the documents referenced by plaintiff -- the Mannchen declaration, the Comstock environmental assessments, and the 1992 9B Procedures.  Thus, there is no prejudice to plaintiff from the Court's reliance on these documents -- and no need to take discovery of defendants since defendants rely on legal arguments -- rather than extra-record facts -- to challenge the standing of plaintiffs.

The Court finds that Mannchen sufficiently describes a demonstrable increased risk of serious environmental harm, which in turn results in a particularized injury to his aesthetic and recreational enjoyment of specific Parks affected by directional drilling.  First, he visits and

recreates in the Big Sandy Creek Unit on a regular basis, where Comstock has been authorized by NPS to conduct directional drilling pursuant to the exemption provision in § 9.32(e).  The drilling operations will result in increased noise levels which will impact his ability to watch birds and other animals that will disperse as a result of increased noise.  Moreover, the risk of oil spills and fires from above-ground drilling activities outside of Park boundaries will no longer be considered in making exemption determinations, which will result in a markedly increased chance that such a disaster may occur.

Defendants are correct that some of the risks described by Mannchen are somewhat speculative.  However, the Court concludes that the increase in risk of harm to the environment is sufficiently concrete to establish standing at this stage of the proceedings.  Little, if any, speculation is involved in concluding that noise from the above-ground drilling operations adjacent to the Big Sandy Creek Unit will cause wildlife to disperse.   The environmental assessments themselves attest to this.  See EA for the Collins #3 Well at 17-18 (Pls.' Ex. 2) ("Elevated noise could displace wildlife, but most wildlife is expected to return after becoming acclimated to some noise disturbance.  Displaced wildlife could increase competition in adjacent areas over the short-term.").

The increased risk of wildfires described by Mannchen further demonstrates a concrete injury to plaintiffs' particularized interest in using the affected areas.  Mountain States Legal Found. v. FERC, 92 F.3d 1228, 1234 (D.C. Cir. 1996), recognizes that wildfires fall in that category of environmental harms that are, by their nature, "probabilistic," but that nonetheless may be sufficient "'to take a suit out of the category of the hypothetical -- provided that the relief sought would, if granted, reduce the probability.'"  Id. (quoting Village of Elk Grove Village v.

-14-

Evans, 997 F.2d 328, 329 (7th Cir. 1993)).  Here, the increased risk of wildfire is sufficiently

concrete.  The 1992 9B Procedures Manual recognizes that "fire hazard" is one of the threats

associated with directional drilling.  1992 9B Procedures at 11.  Moreover, it is a common sense

proposition that, if plaintiffs prevail in this action, the risk of fire from surface activities adjacent

to the park unit will be taken into account in exemption decisions, and the risk will be reduced

because, where the risk of fire is indicated, an operator will be subject to the safeguards in an

approved "plan of operations."  Although difficult to quantify, the risk appears at least as

significant as that presented in Mountain States.  See id. at 1235 (noting the "sensible

recognition" in the case law that "the potential destruction of fire is so severe that relatively

modest increments in risk should qualify for standing").

      Defendants also contend that plaintiffs lack standing on the ground that they have failed

to satisfy the causation and redressability elements of the standing test.  Defendants argue that the

actual source of the harm to plaintiffs' interests is not the 2003 Guidance or the Comstock

decisions but rather the regulatory language of § 9.32(e) promulgated in 1978, which requires

NPS to limit its inquiry for directional drilling exemptions to the impacts of downhole activities

within park unit boundaries.  For that same reason, defendants contend that a favorable decision

from the Court would provide no redress because the 1978 regulations -- unchallenged here --

would remain in place.  However, defendants' argument presumes that it will prevail on the

merits -- that is, that the Court will agree with their interpretation of § 9.32(e).  This ignores the

requirement that, in reviewing standing, a court presumes that the plaintiff will prevail in the

action.  See Florida Audubon Soc'y, 94 F.3d at 664 & n.1, 665.  Applying that presumption, the

Court finds that plaintiffs satisfy the causation and redressability elements.  Hence, because the

Court also concludes that a sufficient showing of injury-in-fact has been made at the motion to dismiss stage, plaintiffs have met their burden of establishing standing.

## II.     Final Agency Action

### A.     2003 Guidance Document

Plaintiffs claim a right to judicial review of the 2003 Guidance under the APA, which provides for review of "agency action" that is "final."[6]  5 U.S.C. §§ 702, 704.  Defendants contend that the 2003 Guidance is not "agency action" within the meaning of the APA or, alternatively, that the Guidance is not a "final agency action" because it creates no obligations beyond those previously established by regulation.  They characterize the Guidance document as only reiterating the requirements of the 9B Regulations in order to correct the misapplication of those regulations at one park.  In contrast, plaintiffs contend that the 2003 Guidance sets forth a new interpretation of the 9B Regulations that departs from NPS's past long-standing interpretation and, as such, constitutes both an "agency action" and a "final agency action."

Before turning to an assessment of the final agency action question, the Court addresses the threshold issue, raised by plaintiffs, of whether it should resolve this question at the motion to dismiss stage at all.  Plaintiffs contend that the issue whether the 2003 Guidance creates new obligations is closely intertwined with the merits -- whether the Guidance was issued in compliance with APA procedures -- and thus, pursuant to Herbert v. Nat'l Acad. of Sciences, 974 F.2d at 198, a decision should be deferred until the merits are heard or, alternatively, that discovery should be permitted.  However, Herbert suggests such deferral or discovery only where

---

[6]  Neither the Organic Act nor NEPA creates a private right of action for violations of its provisions.

the court must rule on "disputed jurisdictional facts."  Id.  That is not the case here because the analysis turns primarily on the text of three documents -- the 9B Regulations, the 1992 9B Procedures, and the 2003 Guidance.  The Court does not rely on the NPS declaration submitted by defendants to determine the meaning of any of these documents or to otherwise determine whether the 2003 Guidance constitutes final agency action.  The regulations and documents speak for themselves.  Under these circumstances, no discovery is appropriate.  Nor is submission of the full administrative record necessary to determine whether the 2003 Guidance effected a change in agency interpretation of the 9B Regulations from that expressed by NPS in 1992.

The requirements for "agency action" and "final agency action," although often analyzed separately, substantially overlap in their focus on whether the action at issue creates new legal obligations or consequences or sets forth a new interpretation of the law.  Specifically, the APA defines "agency action" to include a "rule,"[7] which in turn is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."  5 U.S.C. § 551(4) (emphasis added).  To satisfy the finality requirement, the agency action must "be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spears, 520 U.S. 154, 177-78 (1997) (quoted in National Ass'n of Home Builders v. Norton, 415 F.3d 8, 13-14 (D.C. Cir. 2005)).[8]  Thus,

---

[7]  "Agency action" is defined, in full, as "the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

[8]  The other element for "final" agency action is that the action under review "must mark the 'consummation' of the agency's decisionmaking process."  Bennett v. Spears, 520 U.S. at 177- (continued...)

defendants' arguments, although cast separately, raise the same issue:  whether the 2003

Guidance creates any new legal obligations or sets forth a new interpretation of law.[9]

Defendants contend that the Guidance does not change any "law or policy" because the

legal criteria governing § 9.32(e) exemptions are created by the 9B Regulations promulgated in

1978, not by the 2003 Guidance.  According to defendants, the "plain language" of the 9B

Regulations limit the exemption process to those aspects of the directional drilling operation

occurring <u>within</u> the boundary of a park unit -- that is, threats to park resources from the

downhole activities within the boundary, which necessarily excludes from consideration threats

to park resources associated with surface activities outside park boundaries -- and the 2003

Guidance only reiterates this limitation.  <u>See</u> 2003 Guidance at 2, 3.  This argument relies heavily

on the focus of the § 9.32(e) exemption criteria on impacts from "operations" and a separate

_____

[8](...continued)
78.  Defendants do not contend that the 2003 Guidance lacks finality as to that element.  Indeed,
the issuance of the preliminary guidance on the subject of the § 9.32(e) exemption, followed by
"extensive input from the Solicitor's Office and staff specialists," field review, and headquarters
review, and then its issuance under a cover memo labeling the document "Final Guidance,"
leaves little room for making such an argument.

[9]  Plaintiffs' focus on the use of mandatory language in the 2003 Guidance as indicia of
final agency action, and their reliance on cases to that effect, is misplaced.  The key to those
cases was not simply the use of mandatory language, but rather the creation of new legal
obligations or consequences that did not exist before.  <u>See</u>, <u>e.g.</u>, <u>National Ass'n of Home Builders
v. U.S. Army Corps of Eng'rs</u>, -- F.3d --, 2005 WL 1789740, *3, *6 (D.C. Cir. July 29, 2005)
(regulatory general permits under review that "reduced the authorized maximum acreage impact"
of construction activity allowed by earlier versions of the permits "create legal rights and impose
binding obligations" despite possibility that affected parties may obtain another type of permit);
<u>Appalachian Power Co. v. EPA</u>, 208 F.3d 1015, 1028 (D.C. Cir. 2000) ("we are convinced that
elements of the Guidance . . . significantly broadened the 1992 rule"); <u>CropLife America v. EPA</u>,
329 F.3d 876, 884 (D.C. Cir. 2003) ("Because the new rule [in the form of a press release] effects
a dramatic change in the agency's established regulatory regime," notice and comment procedures
were required.).  Thus, as explained above, the Court focuses its inquiry on whether the 2003
Guidance creates <u>new</u> legal obligations or consequences, or sets forth a <u>new</u> interpretation of law.

definitions provision in § 9.31(c) that appears to limit "operations" to activities that occur "within a unit." Id.

Before parsing through the regulatory text relating to this "plain language" argument, the Court pauses to explain the standard of review that applies to defendants' characterization of the regulatory text.  Defendants submit that their "interpretation" is entitled to substantial deference, pursuant to Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulation.").  However, the Supreme Court has more recently stressed that judicial deference to an agency's interpretation "is warranted only when the language of the regulation is ambiguous."  Christensen v. Harris County, 529 U.S. 576, 588 (2000); In Re Sealed Case, 237 F.3d 657, 667 (D.C. Cir. 2001).[10] Because the crux of defendant's argument is that the plain language of § 9.32(e), as its terms are defined in § 9.31, is capable of only one meaning -- and hence lacks any ambiguity -- the Court considers de novo whether the plain language of the 9B Regulations forecloses consideration of threats to park resources from surface activities outside of park unit boundaries.

Section 9.32(e) states that operators using directional drilling techniques causing the drill hole to cross into a park unit must comply with the 9B Regulations:

> Except, that the operator need not comply in those areas where, upon application of the operator or upon his own action, the Regional Director is able to determine from available data, that such operations pose no significant threat of damage to park resources, both surface and subsurface, resulting from surface subsidence, fracture of geological formations with resultant fresh water acquifer contamination, or natural gas escape, or the like.

---

[10]  This principle is implicit in Thomas Jeffers Univ., where the Supreme Court explained that courts "must defer to [an agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language' . . . ."  512 U.S. at 512 (emphasis added).

The term "operations" is, in turn, defined as:

> All functions, work and activities <u>within a unit</u> in connection with exploration for and development of oil and gas resources, the right to which is not owned by the United States, including:  gathering basic information required to comply with this Subpart, prospecting, exploration, surveying, preproduction development and production; gathering, on-site storage, transport or processing of petroleum products; surveillance, inspection, monitoring, or maintenance of equipment; reclamation of the surface disturbed by such activities; and all activities and uses reasonably incident thereto performed <u>within a unit,</u> including construction or use of roads, pipelines, or other means of access or transportation on, across, or through federally owned or controlled lands and waters, regardless of whether such activities and uses take place on Federal, State or private lands.

36 C.F.R. § 9.31(c) (emphasis added).  This geographical limitation is further reiterated in the purpose and scope section of the 9B Regulations, which expressly provides that the regulations apply only to "activities <u>within any unit</u> of the National Park System." <u>Id.</u> § 9.30(a) (emphasis added).

This recitation of the regulatory text leaves no room for debate:  the plain language of the 9B Regulations limits NPS's exemption process to consideration of impacts from activities within a unit.  Reading § 9.32(e) with the definition of "operations" substituted in place of that term in brackets, § 9.32(e) provides for an exemption where "the Regional Director is able to determine from available data, that such [functions, work and activities <u>within a unit</u> in connection with exploration for and development of oil and gas resources, the right to which is not owned by the United States, including . . . all activities and uses reasonably incident thereto performed <u>within a unit</u>] pose no significant threat of damage to park resources . . ."  The plain language thus limits NPS to considering impacts resulting from "activities within a unit," and leaves no room for consideration of impacts from activities outside of a park unit.

Plaintiffs nonetheless contend that the regulations are ambiguous with regard to impacts from activities outside of a park unit and, furthermore, that defendants have reversed their prior interpretation of § 9.32(e).  They cite three regulatory provisions in support of their ambiguity characterization, none of which alters the limitation of "operations" to activities "within a unit." First, they focus on the last clause of the definition of operations which provides that the term includes "all activities and uses reasonably incident thereto performed within a unit . . . regardless of whether such activities and uses take place on Federal, State or private lands." Plaintiffs cite the dictionary definition of "thereto" as meaning "to that," "to it", or -- paraphrasing the dictionary -- to those, which they would then incorporate into the clause as follows:  "all activities and uses reasonably incident [to those] performed within a unit . . . regardless" of where the activities take place.  Pls.' Mem. at 35 & n. 16.  However, this strained reading of "thereto" ignores the first and primary sentence of the definition, which states that "operations" are "functions, work and activities <u>within a unit</u> in connection with exploration for and development of oil and gas resources . . . <u>including</u>" the stated list of activities.  The clause regarding "reasonably incident" activities quoted by plaintiffs is the final example of activities "includ[ed]" in "functions, works and activities within a unit," and thus must be a subset of the "functions, work and activities within a unit."  <u>See</u> <u>P.C. Pfeiffer Co. v. Ford</u>, 444 U.S. 69, 77 n.7 (1979) (the word "including" indicates that the enumerated activities "are a part of the larger group of activities" described before the word "including"); <u>see</u> <u>also</u> <u>Dong v. Smithsonian Inst.</u>, 125 F.3d 877, 880 (D.C. Cir. 1997) (noting that the word "includes" normally "sets out examples of some 'general principle'") (quoting <u>Federal Land Bank of St. Paul v. Bismarck Lumber Co.</u>, 314 U.S. 95, 100 (1941)).  The reference to activities taking place on State and private lands likewise must

be read consistent with the limitation from the first sentence.  So understood, this provision can

refer only to State and private holdings within a park unit -- a conclusion confirmed by agency

counsel at the hearing and further supported by the identification of such inholdings in the

purpose and scope provision as one of the two types of properties to be addressed by the 9B

Regulations.  See 36 C.F.R. § 9.30(a) (explaining that the rights to oil and gas located "within"

park units addressed by the 9B Regulations "most frequently arise in one of two situations:  first,

"[w]hen the land is owned in fee" within the unit, and second, when a grantor of a surface estate

reserves the subsurface rights to oil and gas).

Second, plaintiffs characterize a separate 9B regulation -- § 9.37(a)(2) -- as recognizing

that NPS regulates directional drilling without regard to the boundaries of a park unit.  This

section provides:  "The Regional Director shall not approve a plan of operations: . . . (2) [f]or

operations at a site, the surface estate of which is not owned by the Federal government, where

operations would constitute a nuisance to . . . [or] would significantly injure" federal lands or

waters.  Id.  But this provision starts with the limiting phrase "[f]or operations at a site," and

again, "operations" are, by definition, activities "within a unit."  This provision, then, speaks only

to operations taking place on inholdings.  NPS assertion of authority over "operations" pursuant

to § 9.37(a)(2), therefore, does not create an ambiguity in the use of the term "operations" in

§ 9.32(e).

Plaintiffs advanced a third source of ambiguity at the motions hearing.  See Tr. at 41-43.

They contend that the regulatory list of threats to park resources in the § 9.32(e) exemption

provision is ambiguous because it ends with the catch-all phrase "or the like."  However, "or the

like" describes the kinds of threats to park resources that are considered -- not the oil and gas

exploration activities causing such threats.  As to the oil and gas activities causing the threats,

§ 9.32(e) is clear:  the Regional Director considers whether "such <u>operations</u> pose no significant

threat of damage to park resources . . . . "  Impacts falling under the category "[o]r the like" still

must be impacts from "operations," as the latter term is defined in § 9.31(c) and employed in

§ 9.32(e).

Accordingly, looking only at the regulatory text, the Court concludes that the plain

language of the regulation limits the impacts that NPS may consider during the exemption

process to those impacts from "functions, work and activities <u>within a unit</u> in connection with"

oil and gas exploration and development, and thus necessarily excludes consideration of impacts

from activities outside of the park unit boundaries.  That being the case, the reiteration of this

limitation in the 2003 Guidance does not give rise to new legal obligations or legal

consequences.  As explained in <u>Indep. Equip. Dealers Ass'n v. EPA</u>, 372 F.3d 420, 428 (D.C.

Cir. 2004) ("<u>IEDA</u>"), an agency document "restating" an agency interpretation is not reviewable

"agency action" or "final agency action."  <u>See also</u> <u>Gen. Motors Corp. v. EPA</u>, 363 F.3d 442, 449

(D.C. Cir. 2004) (holding that agency statement was not reviewable agency action where the

agency "repeated its regulatory interpretation" from a prior policy document issued years earlier).

This principle extends as well to agency restatements of the requirements of the plain language of

a rule, as indicated by the analogy drawn by the <u>IEDA</u> court with respect to the annual

republication of regulations in the Code of Federal Regulations:  "Just as it would be folly to

allow parties to challenge a regulation anew each year upon the annual re-publication of the Code

of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory

interpretation each time it is repeated."  372 F.3d at 428.  The court in <u>IEDA</u> explained that such

a restatement may have certain attributes of a "rule" -- it will be a "statement of general or particular applicability" and be of "future effect insofar as it may inform the future conduct" of the regulated community and, implicitly, the agency.  Id.  Nonetheless, it will not ultimately constitute a "rule" because, in and of itself, it does not "implement, interpret or prescribe law or policy," because it "tread[s] no new ground."  Id.

If the Court had before it only the 9B Regulations and the 2003 Guidance, this would be a straightforward matter, applying the principles articulated in IEDA.  The case is not quite so simple, however.  As noted earlier, plaintiffs contend that NPS has reversed a prior contrary interpretation of § 9.32(e) that was set forth in the 1992 9B Procedures.  Although defendants dispute plaintiffs' characterization of the 1992 9B Procedures (see Defs.' Mem. at 17), they do concede that the Big Thicket National Preserve office had been applying § 9.32(e) in a manner inconsistent with the plain language of the regulation -- that is, as if the provision allowed NPS to exert regulatory control over the portion of a directional drilling operation occurring outside park unit boundaries.[11]  Tr. at 5-6.  Plaintiffs agree that NPS staff were indeed exercising such control but then would go one step further -- plaintiffs assert that NPS interpreted its regulations to require as much in the 1992 9B Procedures.  IEDA and General Motors addressed restatements of prior consistent agency interpretations, and that consistency was significant to the analysis.  To the extent there is a lack of consistency by the NPS in its interpretation of § 9.32(e) -- a matter addressed in detail below -- the applicability of those cases arguably would be limited.  However,

---

[11] Counsel for defendants indicated that there have been eight instances of such misapplication of § 9.32(e) at Big Thicket.  Tr. at 30.  The exact number is not germane to the analysis here, but further underscores plaintiffs' point -- which the Court accepts here -- that the practice of considering impacts from surface activities outside of the park unit was commonplace at Big Thicket National Preserve.

the Court finds it significant that in <u>IEDA</u> and <u>General Motors</u> the agency actions at issue were reiterations of "interpretations" in prior guidance documents, in contrast to reiterations of the plain language of a regulation.  Interpretations inherently involve ambiguous regulations, and the courts have been wary of interpretations that shift over time through, guidance, letters, and press releases.  <u>See</u>, <u>e.g.</u>, <u>Appalachian Power</u>, 208 F.2d at 1020.  However, as the court explained in <u>IEDA</u>, repeating the requirements directly from the Code of Federal Regulations presents an even stronger case for finding no reviewable agency action because previously established regulations are merely being repeated, not changed.  372 F.3d at 428.  Thus, despite the lack of consistency in NPS's prior discussions of § 9.32(e), the Court reads <u>IEDA</u> to apply here because the 2003 Guidance repeats the requirements of the plain language of the regulation.

Plaintiffs rely heavily on the well-established principle that an agency may not change an interpretation of a regulation without providing public notice and an opportunity to comment. <u>See</u> <u>Paralyzed Veterans of Am. v. D.C. Arena, L.P.</u>, 117 F.3d 579, 586 (D.C. Cir. 1997); <u>Alaska Prof'l Hunters Ass'n, Inc. v. FAA</u>, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999).  "Rule making" under the APA includes the agency process for modifying a rule (5 U.S.C. § 551(5)) and, thus, "[w]hen an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment."  <u>Alaska Prof's Hunters Ass'n</u>, 177 F.3d at 1034.

As a threshold matter, however, the applicability of <u>Paralyzed Veterans</u> and <u>Alaska Prof'l Hunters Ass'n</u> to the instant action is questionable.  Those cases contemplated agency interpretation of an <u>ambiguous</u> regulation.  <u>See</u> <u>Paralyzed Veterans</u>, 117 F.3d at 586 (addressing agency's contention that it was "free to change its interpretation of an ambiguous regulation" and

whether <u>Chevron</u> deference to agency interpretation of ambiguous statutes was applicable to

agency regulations); <u>Alaska Prof'l Hunters Ass'n</u>, 177 F.3d at 1031 (considering whether

"commercial operators - persons who operate aircraft for compensation or hire" included

"hunting and fishing guides who pilot light aircraft").  As explained above, the Court concludes

that § 9.32(e) is not ambiguous on the subject of the Park's authority to consider impacts from

surface activities <u>outside</u> of park unit boundaries.  Indeed, had NPS initially issued an

interpretation of § 9.32(e) that was contrary to its plain language, that interpretation could not

have been upheld.  <u>See In Re Sealed Case</u>, 237 F.3d at 669 (rejecting agency interpretation that

conflicted with plain language of agency regulation).  Extending <u>Paralyzed Veterans</u> and <u>Alaska</u>

<u>Prof'l Hunters Ass'n</u> to situations where an agency is attempting to correct statements that are

contrary to the plain language of its regulations would be problematic because the predicate for

the holdings in those cases is that the first interpretation is a reasonable one under the APA.

 In any event, however, this issue need not be addressed further because a review of the

1992 9B Procedures reveals that it does not actually contain an interpretation of the § 9.32(e)

exemption provision with respect to impacts on park resources from surface activities outside of

a park unit.  The excerpt cited by plaintiffs states that "the Regional Director must determine that

the proposed directional drilling operation poses no significant threat of damage to unit resources

and values."  1992 9B Procedures at 11.  The Procedures then list circumstances where "a

directional drilling operation would pose a significant threat to unit resources and values," and

identify several impacts that would more likely be associated with surface activities, which are

necessarily outside of the boundaries of a park unit in a directional drilling situation.  Plaintiffs

quote the following impacts from the 1992 9B Procedures as falling within this category:

- . . . substantially change wildlife patterns;
- cause an exceedance of an air quality increment . . . under the Clean Air Act;
- drastically change vegetative community structure or composition, including influx of exotic species;
- present an obvious fire hazard;
- damage cultural resources to a unit.

Pls.' Mem. at 29 (quoting 1992 9B Procedures at 11-12).  Plaintiffs further point out that the

2003 Guidance provides revised pages omitting these impacts, and instead listing only those

impacts identified in § 9.32(e) itself:  "surface subsidence; fracture of geological formations with

resultant fresh water contamination; natural gas escape; or the like."  See 2003 Guidance, Section

V, at 12A (Revised 9B Procedures) (Defs.' Ex. 5).

The broader list of impacts in the 1992 9B Procedures, however, is silent as to whether

the impacts must be from activities within a park unit or may also encompass impacts from

surface activities outside of unit boundaries.  To be sure, as defendants acknowledged at the

motions hearing, many of the impacts listed in the 1992 9B Procedures appear to relate to

impacts from surface activities.  But a directive to consider impacts from surface activities

outside of a park unit is not expressly articulated.   Thus, to interpret the list as authorizing

consideration of impacts from surface activities outside of a park unit would require one to

conclude that the listed impacts can result only from such surface activities, and cannot result

from downhole drilling within a unit.  Plaintiffs, however, do not make this contention, and

indeed such a contention would be implausible.  As plaintiffs acknowledged at the hearing,

changes in wildlife patterns, changes in vegetation, fire hazards, damage to cultural resources,

and even air quality impacts are all impacts that also could, at least potentially, flow from

downhole drilling activities.  See Tr. at 43-45.  Therefore, the list of impacts to be considered in

the § 9.32(e) exemption process falls far short of establishing that NPS has interpreted § 9.32(e)

to authorize consideration of impacts from surface activities outside of a park unit.

To be sure, the list in the 1992 9B Procedures may cause confusion to the extent that the

impacts are more closely associated with surface activities outside of a park unit, in contrast to

downhole drilling within a unit.  But such confusion is simply insufficient to establish that NPS

has interpreted § 9.32(e) to extend its jurisdiction over surface activities outside of park unit

boundaries where operations within the unit do not pose a threat to park resources.  The fact that

the 2003 Guidance provided revised pages that omitted the foregoing list of impacts in favor of

repeating the actual regulatory language of § 9.32(e) does not somehow convert that confusion

into an interpretation.

Plaintiffs point to another excerpt from the 1992 9B Procedures as reflecting a prior

contrary interpretation, wherein a "step-by-step process to guide NPS managers" in the proper

application of the 9B Regulations makes reference to managers gathering information about the

surface location of the operator.  In this respect, the 1992 9B Procedures Manual states that in

going through the § 9.32(e) analysis:  "the Superintendent should instruct the operator to submit

specific relevant information and the Superintendent should conduct an on-site investigation of

the proposed operational location."  1992 9B Procedures at 47.  Information to be submitted by

the operator "should" include "a brief description of the proposed operation; a map . . . showing

the proposed surface location and the bottom-hole location of the well; and actions that the

operator will take to prevent adverse impact to unit resources and values."  Id. at 47-48.  Once

again, however, the quoted excerpts fall short of establishing that NPS previously interpreted the

exemption under § 9.32(e) to require consideration of surface impacts outside of a park unit

boundary.  The quoted language instructs NPS managers to gather information about the

proposed site -- basic information that would be essential to determine where NPS jurisdiction

begins and ends.  It reveals nothing about how information regarding the surface location should

be considered in making the substantive exemption determination.  The regulation, on the other

hand, is not ambiguous, as discussed at length above.  By its plain language, the regulation limits

the impacts NPS may consider to those within the park unit.

Indeed, other portions of the 1992 9B Procedures underscore the consistency in excluding

impacts from surface activities outside of a park unit from the § 9.32(e) exemption process.

The 1992 9B Procedures state that, as to vertical drilling:  "If the operator proposes to drill a

vertical well outside unit boundaries, the operator is exempt from the 36 CFR 9B regulations.

End of process. (See Chapter 6, Enforcement, if the operator damages or injures unit resources or

values.)"  Id. at 48.  In other words, harm from the vertical well is foreseeable, but the operator is

nonetheless excluded from the 9B Regulations by virtue of having his activities located outside

the boundary of the park unit.  This statement underscores the importance of locating activities

physically within the park unit boundary in order to be subject to the 9B Regulations.

Because the 1992 9B Procedures do not actually contain an interpretation of the § 9.32

exemption criteria with respect to impacts from surface activities outside of the boundaries of a

park unit, the statements in the 2003 Guidance limiting NPS consideration to impacts from

activities within a park unit – that is, impacts from downhole drilling – do not yield a change in

interpretation.[12]  Rather, the 2003 Guidance is more properly seen, as defendants urge, as a

---

[12]  Plaintiff's amended complaint also references a table in the 1992 9B Procedures --
"Table 5.1" -- that more directly identifies impacts from the "surface wellpad" as impacts to be
(continued...)

statement of the plain meaning of the 9B Regulations, intended in part to correct misapplication

of § 9.32(e).  When so viewed, the 2003 Guidance is not final agency action requiring notice and

public comment or subject to judicial review.

### B.        Comstock FONSI and Exemption Determinations

Defendants recognize that plaintiffs' amended complaint includes a challenge to the

agency decisions relating to two Comstock directional drilling operations that included both

findings of no significant impact ("FONSIs") pursuant to NEPA and individual exemption

determinations made pursuant to § 9.32(e).  Defendants contend that these admittedly "final

agency actions" are not judicially reviewable on the ground that plaintiffs' challenge constitutes

---

[12](...continued)
considered under the § 9.32(e) exemption analysis.  Am. Compl. ¶ 31.  Plaintiffs later
acknowledge in their brief that the table is not in the 1992 9B Procedures, but instead is in a
document referred to as a "draft Operator's Handbook" issued in 2002.  Pls.' Mem. at 7 n.2; see
also Defs.' Mem. at 17 n.8 & Ex. 7.  Whether a draft document could constitute an interpretation
binding on the agency is highly questionable.  See Southern Utah Wilderness Alliance v. Dabney,
222 F.3d 819, 829 (10th Cir. 2000) (holding that a draft document did not constitute an
interpretation because it "had not yet been finalized or adopted by the agency").

In any event, the Court finds that the cited provisions of the draft handbook addressing
the requirements of § 9.32(e) are ambiguous.  Under the heading "36 CFR §9.32(e) Application
Process," it is indicated that much of the environmental impact information included in the
application is necessary for the NEPA environmental assessment.  Id. at 5-3 (information needed
for environmental assessment includes "methods that would be used to minimize or avoid
impacts on park resources").  But the NEPA environmental assessment considers "the
environmental impacts of the proposed action" without the boundary limitations of § 9.32(e), and
thus, as plaintiffs' counsel noted at the hearing, impacts from surface activities occurring outside
of a park unit must be considered.  The extent to which impacts from surface activities must be
considered as part of the § 9.32(e) analysis is not clear from the draft handbook.

Turning next to the list of mitigation measures in Table 5.1, the table does include
"suggested mitigation measures" related to reducing impacts from surface activities outside of a
park unit.  However, what is not present in the table and accompanying text is an interpretation
of the terms of § 9.32(e) to authorize NPS to consider such impacts in the exemption analysis.  There
is an assumption that NPS will process applications in a certain manner, but no interpretation of
the regulation.  Thus, the draft Operator's Handbook adds nothing to the analysis here.

an impermissibly broad programmatic challenge to the entire directional drilling program that, as

such, is precluded by <u>Lujan v. National Wildlife Fed'n</u>, 497 U.S. 871 (1990).  Plaintiffs contend

that the FONSI and exemption determinations are garden-variety APA final agency actions for

which they seek ordinary APA relief, including setting aside the challenged actions.  Although

they also seek other relief that clearly goes further, plaintiffs contend that nothing in the case law

precludes them from challenging otherwise reviewable agency actions.

   This challenge to the Comstock determinations is not comparable to the programmatic

challenge in <u>Lujan</u>.  In <u>Lujan</u>, the plaintiffs styled their complaint as a challenge to an agency's

entire program -- the "land withdrawal review program" -- based on a litany of alleged failures in

the agency's administration of the program, as well as "1250 or so individual classification

terminations and withdrawal revocations" regarding public lands.  <u>Lujan</u>, 497 U.S. at 875, 881.

The Supreme Court emphasized that the "land withdrawal review program" described by

plaintiffs did not "refer to a single [agency] order or regulation, or even to a completed universe

of [agency] orders and regulations, but rather referred to the "continuing operations" of the

agency in reviewing withdrawal revocation applications and classifications of public lands.   <u>Id.</u>

at 890.  The Court therefore dismissed the challenge even though plaintiffs styled their complaint

as including challenges to 1250 individual classifications.  <u>Id.</u> at 890, 893.  However, the

Supreme Court made clear that judicial review would be appropriate "when, and to the extent

that, a specific 'final agency action' has an actual or immediately threatened effect," even where

judicial intervention "may ultimately have the effect of requiring a regulation, a series of

regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful

result that the court discerns."  <u>Id.</u>

On that reasoning, in <u>Sierra Club v. Peterson</u>, 228 F.3d 559 (5th Cir. 2000) (en banc), the Fifth Circuit rejected a programmatic challenge to a timber management program even though plaintiffs cited 12 illegal timber sales that were otherwise final agency actions, because plaintiffs were only using those actions as "evidence" of broad programmatic violations.  However, the court emphasized that, on remand, "[the] proceedings may include a trial limited to any existing specific final agency actions the environmental groups wish to challenge . . . which have an 'actual or immediately threatened effect.'"  <u>Id.</u> at 570 n.14.  A similarly broad programmatic challenge was rejected in <u>Nat'l Wildlife Fed'n v. Caldera</u>, 2002 WL 628649 (D.D.C. 2002), because plaintiffs conceded in their filings that, although citing 23 permits as example of an unlawful program, "the purpose of [plaintiffs'] case is not to modify a permit.  It [is] to deal with the broader systemic problems with [the] program."  <u>Id.</u> at *4.

The precedent established by these cases is thus abundantly clear -- plaintiffs are entitled to judicial review of final agency actions, so long as that review is focused on a discrete final agency action.  That is the case here.  Plaintiffs' amended complaint encompasses a challenge to the two discrete agency actions setting forth FONSI and § 9.32(e) exemption determinations for two specific sites.[13]  Although the relief requested in the complaint is sweeping -- "setting aside all Section 9.32(e) exemption determinations made by [NPS] pursuant to the 2003 Guidance, including the [Comstock] exemption determinations" -- it also includes a request for relief specific to each of those two actions.  In light of the Court's dismissal of plaintiffs' challenge to

---

[13]  Defendants at various points concede that site-specific actions are judicially reviewable.  <u>See</u> Defs.' Mem. at 18 n.9; Tr. at 35.  However, they would limit the availability of judicial review depending on the relief sought.  As <u>Lujan</u> explained, however, the type of relief sought does not itself determine whether judicial review is available.  <u>Lujan</u>, 497 U.S. at 890.

the 2003 Guidance, there may be little left to the merits of the challenges to the Comstock

actions.  However, the Court is not in a position at this point to determine the merits of the

challenges to the Comstock actions, given the limited focus and briefing on that aspect of

plaintiffs' action to date.  It suffices for present purposes to note that the Comstock actions are

judicially reviewable.

## CONCLUSION

For the foregoing reasons, the Court holds that plaintiffs have satisfied their burden to

establish standing at the dismissal stage, that the 2003 Guidance is not final agency action subject

to judicial review, but that the two Comstock decisions are final agency actions subject to

judicial review.  Accordingly, defendants' motion to dismiss is granted in part and denied in part.

A separate order will be issued herewith.


/s/
_____
JOHN D.  BATES
United States District Judge

Date:    September 1, 2005


Copies to:

Tanya Sanerib
Eric Glitzenstein
Meyer, Glitzensteing & Crystal
1601 Connecticut Ave., NW
Suite 700
Washington, DC 20009-1056
Email:  tanyasanerib@meyerglitz.com,
        howardcrystal@meyerglitz.com,
        eric@meyerglitz.com

*Counsel for plaintiffs*

Lauren Fischer
U.S. Department of Justice
601 D St., NW
Washington, DC 20004
Email:  lauren.fischer@usdoj.gov

    *Counsel for defendants*