# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIERRA CLUB, et al.,** | |
| **Plaintiffs,** | |
| **v.** | Civil Action No.  04-2012 (JDB) |
| **FRAN MAINELLA, Director of the National Park Service, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

The National Park Service ("NPS") regulates private oil and gas drilling operations within units of the National Park System pursuant to the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1, <u>et</u> <u>seq.,</u> and the regulations set forth at 36 C.F.R. Part 9, Subpart B ("9B Regulations").  Directional drilling -- the practice of drilling at a slant adjacent to and outside of Park boundaries to extract privately owned oil and gas from beneath the park unit surface -- is also covered by the 9B regulations, but may be exempt from NPS oversight pursuant to 36 C.F.R. § 9.32(e) where a regional director determines that the operations within a park unit pose no significant threat of damage to park resources.  Plaintiffs challenge the framework for this decisionmaking, as embodied in three site-specific final actions exempting directional drilling activities in and around Big Thicket National Preserve in Texas, alleging that NPS failed to consider environmental impacts from oil and gas operators' surface activities adjacent to and outside park boundaries in violation of the Organic Act, 16 U.S.C. § 1, the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the National Environmental Policy Act ("NEPA"),

42 U.S.C. §§ 4321-4370e.[1]   Currently pending before the Court are plaintiffs' and defendants' cross-motions for summary judgment.  A hearing on the motions was held on September 8, 2006.

Neither the parties nor the Court are writing on a blank slate.  The Court previously addressed plaintiffs' standing and the meaning of section 9.32(e) in the context of plaintiff's APA challenge to an NPS guidance document issued in 2003 that allegedly changed a prior NPS interpretation of section 9.32(e).  See Sierra Club v. Mainella, No. 04-2012, 2005 WL 3276264 (D.D.C. Sept. 1, 2005) ("Sierra Club I").  The Court concluded that the plain language of section 9.32(e) limits the impacts NPS may consider to those from activities within a park unit, and thus the restatement of that requirement in the later guidance document was not a final agency action subject to judicial review.  Id. at *11-12.  That decision expressed no opinion on the merits of either the regulation or the three site-specific exemption decisions made by NPS under the Organic Act or NEPA.[2]   Plaintiffs now argue that NPS's application of section 9.32(e) has resulted in exemption decisions that are contrary to the Organic Act and violate the procedural requirements of NEPA.  Defendants once again challenge plaintiffs' standing, and also defend the framework of decisionmaking and the merits of each of the three challenged decisions.

---

[1]  Plaintiffs' amended and supplemental complaints also allege violations of NPS Management Policies, but the Court of Appeals has recently held that the Management Policies are not judicially enforceable.  The Wilderness Soc'y v. Norton, 434 F.3d 584, 596-97 (D.C. Cir. 2006) (holding that "the Management Policies . . . does not create enforceable regulations or modify existing legal rights").  Thus, the Court will not consider the alleged violations of the Management Policies as a separate claim.  The document is, however, not entirely irrelevant. NPS relied on statements and interpretations in the Management Policies in making the decisions under review, and the Court will refer to the Management Policies insofar as the decisions under review have done so.

[2]  Plaintiffs' claims regarding lack of notice and opportunity to comment on the guidance document, based on its application to site-specific decisions, technically remain live after Sierra Club I because that ruling allowed the challenges to site-specific decisions to go forward.  See 2005 WL 3276264 at *17; see also Am. Compl. ¶ 52; Suppl. Compl. ¶ 8.  But success on those claims is, as a practical matter, precluded by Sierra Club I, and plaintiffs have not briefed them further.  Therefore, the Court will dismiss those claims in the Order accompanying this Opinion.

## BACKGROUND

**I.      Statutory and Regulatory Background**

The National Park Service Organic Act of 1916 provides for NPS management of the

national park system, and establishes a mandate to regulate the use of parks in a manner that will

protect park resources from impairment:

> The service . . . shall promote and regulate the use of the . . . national parks . . . by
> such means and measures as conform to the fundamental purpose of the said parks
> . . . which purpose is to conserve the scenery and the natural and historic objects
> and the wild life therein and to provide for the enjoyment of the same in such
> manner and by such means as will leave them unimpaired for the enjoyment of
> future generations.

16 U.S.C. § 1.  This mandate is confirmed by the NPS General Authorities Act of 1970, as

amended, 16 U.S.C. § 1a-1, and also is reflected in the legislation establishing the individual

parks, including Big Thicket National Preserve.  See 16 U.S.C. § 1a-1 ("The authorization of

activities shall be construed, and the protection, management, and administration of these areas

shall be conducted in light of the high public value and integrity of the National Park System and

shall not be exercised in derogation of the values and purposes for which these various areas

have been established," except as otherwise provided by Congress); 16 U.S.C. § 698c(a) ("Such

lands [i.e., Big Thicket National Preserve] shall be administered by the Secretary as a unit of the

National Park System in a manner which will assure their natural and ecological integrity in

perpetuity in accordance with . . . the provisions of . . . sections 1 and 2 to 4 of this title").  NPS

has construed the "derogation" standard in the General Authorities Act as a reiteration of the

"impairment" standard set forth in the Organic Act -- that is, a duty to prohibit the impairment of

the integrity of park resources and values.[3]  See NPS Management Policies 2001 at 12 (Pls.'

Mem., Ex. 1).

The NPS promulgated the 9B Regulations in 1978 to control activities within the

National Park System with respect to the exercise of rights to oil and gas owned by private

entities where access is on, across, or through federally owned or controlled land or waters.  See

36 C.F.R. § 9.30(a).  Such rights arise most frequently where the land within a park unit is owned

in fee by a private party, including the right to oil and gas, or, most relevant here, "[w]hen in a

transfer of the surface estate to the United States, the grantor reserved the rights to the oil and

gas."  Id.  The regulations generally prohibit the granting of access through federal lands or

waters unless the operator has an approved "plan of operations," which "serves as the operator's

access permit" and sets forth information regarding, inter alia, the various "environments to be

affected by operations" and "steps to be taken . . . to mitigate any adverse environmental effects."

 Id. §§ 9.32(a), 9.36(a)(16).  Operators subject to the 9B Regulations also must take "all

technologically feasible precautions" to prevent a well from blowing open or becoming wild and

to prevent accidents and fires. Id. §§ 9.44, 9.46.  Any operator outside the boundaries of a park

unit must comply with these requirements if he is using directional drilling techniques that result

in the drill hole crossing into the unit and passing under any federal land or water.  Id. § 9.32(e).

However, an exemption is available where "the Regional Director is able to determine from

_____

[3]  Plaintiffs also have made sporadic references to a separate NPS duty to conserve park resources and values pursuant to the clause in 16 U.S.C. § 1 providing that NPS shall regulate the use of parks "to conserve the scenery and the natural and historic objects and the wild life therein."  Pls.' Mem. at 28-29, 31.  However, plaintiffs have not explained how this duty differs from the nonimpairment mandate, which is the focus of their arguments.  See id.; see also Pls.' Mem. at 2; Summ. J. Hr'g Tr. at 3.  Indeed, the text of section 1 suggests that the nonimpairment mandate encompasses the conservation clause.  For purposes of reviewing the Organic Act claim, then, the Court will, consistent with plaintiffs' briefs, focus on the nonimpairment mandate.

available data, that such operations pose no significant threat of damage to park resources, both surface and subsurface, resulting from surface subsidence, fracture of geological formations with resultant fresh water acquifer contamination, or natural gas escape, or the like." Id.

NPS issued a guidance document in 2003 that states, in relevant part: "The potential impacts considered in the § 9.32(e) exemption process relate only to effects on park resources from downhole activities occurring within the boundary of the park, not threats to park resources associated with the operation outside park boundaries." See Final Guidance on Implementing the Directional Drilling Provision of the Service's Nonfederal Oil and Gas Regulations at 36 CFR 9B ("Guidance") at 2 (emphasis added) (Defs.' Mot. to Dismiss, Ex. 4A-4B). In Sierra Club I, the Court concluded that the Guidance only repeated the requirements of the regulation, and thus did not require notice and comment. 2005 WL 3276264 at *12, *16 (holding that the Guidance reiteration of regulatory requirements "does not give rise to new legal obligations or legal consequences," that the Guidance is "a statement of the plain meaning of the 9B regulations," and thus the Guidance "is not final agency action requiring notice and public comment or subject to judicial review"). This holding was based primarily on the geographical limitation imposed on the key term "operations" as defined by the 9B Regulations -- that is, limiting "operations" to "[a]ll functions, work and activities within a unit in connection with exploration for and development of oil and gas resources" -- a limitation repeated in other parts of the 9B regulations. Sierra Club I, 2005 WL 3276264 at *10 (quoting 36 C.F.R. § 9.31(c)) (emphasis added). As this Court explained:

> Reading § 9.32(e) with the definition of "operations" substituted in place of that term in brackets, § 9.32(e) provides for an exemption where "the Regional Director is able to determine from available data, that such [functions, work and activities within a unit in connection with exploration for and development of oil and gas resources, the right to which is not owned by the United States, including

. . . all activities and uses reasonably incident thereto performed <u>within a unit</u>]
pose no significant threat of damage to park resources . . ."

<u>Sierra Club I</u>, 2005 WL 3276264 at *11.

The NPS, like other federal agencies, also is subject to the procedural requirements of the

National Environmental Policy Act.  NEPA requires a federal agency to prepare an

environmental impact statement ("EIS") for all  "proposals for . . . major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS

must include, among other things, "a detailed statement describing the reasonably foreseeable

environmental impact both of the proposed federal action and of any feasible alternative(s) to the

proposed federal action."  <u>Wyoming Outdoor Council v. U.S. Forest Service</u>, 165 F.3d 43, 49

(D.C. Cir. 1999) (internal quotations omitted).  An EIS is not required if the agency makes a

determination based on a more limited document, an "environmental assessment" ("EA") that the

proposed action would not have a significant impact on the environment.  40 C.F.R. §§ 1501.4,

1508.13.  "The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient

evidence and analysis for determining whether to prepare an [EIS]."  <u>Dep't of Transp. v. Public

Citizen</u>, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).  The agency must consider,

among other things, "cumulative impacts" -- that is, "other past, present, and reasonably

foreseeable future actions regardless of what agency . . . or person undertakes such other actions"

-- as well as impacts from "connected actions" (that is, closely related actions).  40 C.F.R. §§

1508.7, 1508.25(a)(1)-(2); 1508.27(b)(7).  If an agency determines that an EIS is not required, it

must issue a "finding of no significant impact" ("FONSI"), which briefly presents the reasons

why the proposed agency action will not have a significant impact on the human environment.

<u>Public Citizen</u>, 541 U.S. at 757-58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).  The Supreme Court

has explained that "it is now well-settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  Thus, "NEPA merely prohibits uninformed -- rather than unwise -- agency action." Id. at 351.

## II.    Factual Background

The Big Thicket National Preserve ("BTNP" or "Preserve"), established in 1974, is comprised of 15 "units" covering over 88,000 acres of land.  See AR-C 0466.[4]  The United States holds fee simple title to the surface estate of these lands.  Id.  Oil and gas deposits underlying the Preserve are owned by nonfederal entities.  Id. at 0474.  NPS estimates that there are 1.21 million barrels of oil, 70.11 billion cubic feet of natural gas, and 1.02 million barrels of natural gas liquids underlying the Preserve, and projects that 29 wells are reasonably anticipated to be drilled over the next 15 to 20 years, of which 19 would be commercially successful.  Id. From 1999 through 2004, nineteen directional wells were drilled from surface locations outside of the Preserve to reach bottomholes inside the Preserve, excluding the wells at issue in this case.  Id.

The three decisions under review concern directional drilling where the operator's surface activities (that is, the production pad, wellhead, and associated activities) are located approximately 100 to 500 feet outside of the Preserve boundary.  AR-C 0004; AR-B 0003; AR-U 0007.  In September 2004, NPS took final action on the application of Comstock Oil & Gas, Inc. ("Comstock") to directionally drill one well (the "Collins" well) to access oil and gas below the Preserve's Big Sandy Creek Unit.  Collins FONSI (AR-C 0002-0017).  This final action consisted

---

[4]  Three distinct administrative records support the decisions under review in this case. For ease of reference, the Court will refer to each record by the first initial of the well name or company name as follows: AR-C for the Collins record; AR-B for the Black Stone record, and AR-U for the Union Gas record.

of (1) a determination that the directional well qualified for an exemption from the 9B

regulations pursuant to section 9.32(e), (2) a determination that the well (including connected

activities adjacent to the Preserve) would not result in an "impairment" to the integrity of park

resources or values under the Organic Act, and (3) a finding of no significant impact under

NEPA.  AR-C 0002-0008.  In November 2004, NPS took final action on Comstock's application

to drill two other wells -- the Black Stone B1 and D1 wells -- to access oil and gas below the

same Unit, again issuing an exemption determination under section 9.32(e), a nonimpairment

determination under the Organic Act, and a finding of no significant impact.  Black Stone FONSI

(AR-B 0002-0008).  Finally, in June 2005, NPS granted the application of Union Gas Operating

Company ("Union Gas") to drill four wells -- the Nelson well and the BP Rafferty A-45 #1, 2,

and 3 wells ("the Rafferty wells") -- to access oil and gas beneath the Preserve's Neches

Bottom/Jack Gore Baygall Unit, based once again on an exemption determination under section

9.32(e), a non-impairment determination, and a finding of no significant impact.  Union Gas

FONSI (AR-U at 0006-0014).

Each of the three actions was preceded by an environmental assessment that was the

subject of public notice.  See Collins EA (AR-C 0456-0512); Black Stone EA (AR-B at 0197-

0265); Union Gas EA (AR-U 0418-0497).  All three environmental assessments followed the

same template.  Section One acknowledges NPS's statutory and regulatory obligations, including

its duties under the 9B regulations and its broader duties under the nonimpairment mandate of

the Organic Act and NEPA.  See Collins EA at 3-8 (AR-C 0465-0470); Black Stone EA at 4-10

(AR-B at 0207-0213); Union Gas EA at 4-11 (AR-U 0427-0434).  NPS then describes its

"scoping" process -- a process used to identify environmental impact topics and narrow the issues

to be "carried forward" for a more fulsome impairment analysis by the agency.[5]  See Collins EA at 9-21 (AR-C 0471-0483); Black Stone EA at 10-25 (AR-B at 0213-0228); Union Gas EA at 11-24 (AR-U 0434-0447).  The scoping analysis is, in substance, an abbreviated assessment of environmental impacts to screen out insubstantial topics from the impairment analysis.  NPS separated "impacts from in-park operations" and "impacts from connected actions" taking place outside the park boundaries in order to segregate the information to be used in making an exemption determination under section 9.32(e) (that is, impacts from activities "within a unit"), from the broader array of impacts on the human environment examined under the Organic Act and NEPA.  See Collins EA at 11-12 (AR-C at 473-74); Black Stone EA at 13 (AR-B 0216); Union Gas EA at 17, 21 (AR-U 0440, 0444).  NPS defines "connected actions" for directional drilling operations as actions "occurring outside of the park related to the directional drilling operation inside the park includ[ing] the construction of the well/production pad(s), gas sales/transportation line, and access road; drilling and completion; hydrocarbon production and transportation; and well plugging and surface reclamation."  E.g., Collins EA at 8 (AR-C 470); Black Stone EA at 9 (AR-B 0212); Union Gas EA at 10 (AR-U 0433).

---

[5]  "Scoping" is a term of art in NEPA defined as the "process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action."  40 C.F.R. § 1501.7.  Among other things, the agency is to "identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere."  Id. § 1501.7(a)(3).  Although NPS does not reference this regulation, it is readily apparent from the EAs that the scoping analysis was based on the procedures set forth in section 1501.7.  Of course, there is no impediment to NPS's use of this analysis for multiple purposes, including assessments under the Organic Act.

Section Two of the EAs sets forth the two alternatives that were evaluated by NPS, and also describes alternatives that were dismissed. Alternative A in each decision is the "No Action" alternative, an alternative that NEPA requires and that establishes a baseline for comparing the environmental consequences of the action alternative. Collins EA at 23 (AR-C 0485); Black Stone EA at 27 (AR-B 0230); Union Gas EA at 25 (AR-U 0448). Alternative B in each decision is permitting the operator to directionally drill the well as proposed in each application. Collins EA at 23 (AR-C 0485); Black Stone EA at 27 (AR-B 0230); Union Gas EA at 25 (AR-U 0448). Two other alternatives were considered but dismissed from further analysis. Drilling from a surface location inside the park unit, which would have required a 9B plan of operations, was rejected as "unreasonable in terms of economics, logistics, degree of environmental impact, and time required to implement the project." Collins EA at 28-29 (AR-C 0490-0491); Black Stone EA at 37 (AR-B 0240); Union Gas EA at 31 (AR-U 0454). The second dismissed alternative, NPS acquisition of the mineral rights at issue, was rejected because NPS concluded the mitigation measures identified and applied by each operator had substantially reduced the potential for adverse impacts to park resources and values. Collins EA at 29 (AR-C 0491); Black Stone EA at 37 (AR-B 0240); Union Gas EA at 32 (AR-U 0455).

Section Three, entitled "Affected Environment and Environmental Consequences," sets forth NPS's analysis for each of the environmental impacts carried forward from the Section One scoping process, including NPS's "impairment analysis" pursuant to its mandate to prevent impairment of park resources and values under the Organic Act. Collins EA at 33 (AR-C 0495); Black Stone EA at 43 (AR-B 0246); Union Gas EA at 39 (AR-U 0462). This analysis considered both in-park activities and impacts from connected actions. Collins EA at 33-41 (AR-C 0495-

503);  Black Stone EA at 43-53 (AR-B 0246-0256); Union Gas EA at 39-65 (AR-U 0462-0488).

The analyses described the impacts in terms of the area affected ("localized" to the project area,

or "widespread" to other Preserve areas) and duration ("short-term," defined as up to three years,

and "long-term," defined as extending up to 20 years or longer).  NPS also used descriptors for

the intensity of the impact with regard to park resources or values -- negligible, minor, moderate,

or major -- noting that numerical data were presented "[w]here the intensity of the impact can be

described quantitatively," but that "most impact analyses are qualitative."  Collins EA at 33 (AR-

C 0495);  Black Stone EA at 43 (AR-B 0246);  Union Gas EA at 39-40 (AR-U 0462-0463) .

The projected environmental consequences set forth in the scoping analyses and

impairment determinations are in many respects similar because the projects examined all

involve the same kind of activity -- directional drilling -- near the border of the Preserve and

close to water resources.  NPS did not anticipate any adverse impacts as a result of the downhole

activities that would occur within the Preserve, noting that the wellbore would cross into the

Preserve at depths too far below the surface to give rise to environmental impacts.[6]  No one has

contested that finding in the record or in this litigation.  NPS acknowledged a range of impacts

from the surface activities near the Preserve, but as to Collins and Black Stone, dismissed most

of the impacts as not warranting a detailed analysis.  For example, NPS projected increased air

---

[6]  See Collins EA at 14-21 (AR-C 0476-0483) (stating for each dismissed environmental topic, "[t]he wellbore would cross into the Unit at a depth below 5300' true vertical depth (TVD) to a target depth of about 15,200' TVD . . . ; therefore, there would be no impacts . . . from the subsurface oil and gas operations in the Unit"); Black Stone EA at 15-25 (AR-B 0218-0228) (stating for each dismissed impact, "[t]he wellbores would cross into the Unit at depths of approximately 4,825 feet [TVD] (Black Stone B1) and approximately 5,675 feet TVD (Black Stone D1)); Union Gas EA at 21-23 (AR-U 0444-0446) (noting for dismissed impacts that "[t]he proposed wellbores would cross into the Unit at depths of at least 2,850 feet below ground level").

pollution from construction activities, vehicle use, and large gasoline and diesel engines used to power drilling equipment, which would be greatest during the drilling phase (45 days for the Collins well, 80 days for each Black Stone well) and would continue at an unspecified reduced level after drilling, and then concluded that these impacts should be dismissed from further analysis because they would be "at low intensity levels, with localized, short- to long-term, negligible to minor, adverse impacts." Collins EA at 14 (AR-C 0476); Black Stone EA at 15-16 (AR-B 0218-0219). As to impacts from artificial lighting, NPS noted that there were no overnight camping facilities or visitor use development in the Collins area, and only a few in the Black Stone area, and then concluded that these impacts should be dismissed from further analysis because they were "low intensity" and would be "localized, short- to long-term, resulting in a negligible to minor, adverse impact." Collins EA at 14-15 (AR-C 0476-0477); see also Black Stone EA at 16-17 (AR-B 0219-0220) (dismissing lightscape impacts because of their "low intensity").

Impacts on water resources also were dismissed from further analysis. NPS observed that both the Collins and Black Stone wellpads were located in areas that would drain in the direction of water resources located within the Preserve, and for the Black Stone wells, there were floodplains, probable wetlands, and "other waters of the United States" in the analysis area, which was a concern because of the potential for release of contaminants -- oil or gas, brine water, and hazardous substances. Collins EA at 15-17 (AR-C 0477-0479); Black Stone EA at 18-20 (0221-0223). However, for the Collins well, NPS concluded that, in light of Comstock's "proposed surface casing and cementing program, site location, site design, and mitigation measures," impacts would be confined to the wellsite, and the potential for release was

"unlikely."  Collins EA at 16 (AR-C 0478).  As to the Black Stone D1 well, the concerns

appeared more significant.  NPS noted the "potential for negligible to minor, adverse impacts to

water resources, floodplains and wetlands in the Unit due to sheet flow drainage from the [D1]

site," but concluded that "[a]pplication of erosion control and operational mitigation measures

identified in Table 2 are expected to be adequate to protect these resources within the Unit."

Black Stone EA at 19 (AR-B 0222).  NPS further noted that in the event of a spill, "there should

be ample time and space to respond to even a major release before there would be impacts on the

Unit."  Id.

For both the Collins and Black Stone wells, NPS decided to carry forward for further

analysis impacts on the natural soundscape within the Preserve.[7]  NPS noted that elevated noise

would be greatest during the short-term drilling of the wells -- 45 days for the Collins well, 80

days for each of the Black Stone wells -- reaching 90 decibels on the drill rig (a sound level

equivalent to freeway traffic), which would dissipate with distance, approaching natural

background levels (40 decibels) at 1,500 feet from the drill rig.  Collins EA at 37 (AR-C 0499);

Black Stone EA at 47 (AR-B 0250).  NPS estimated that elevated noise would extend up to 1,200

feet into the Unit for the Collins and Black Stone wells, and also noted other localized less

intense increases in noise associated with heavy traffic, heavy equipment and ground disturbing

activities, as well as noise from day-to-day production operations and "workover" operations at

five-to-ten year intervals.  Collins EA at 37 (AR-C 0499); Black Stone EA at 47 (AR-B 0250).

---

[7]  NPS also carried forward the topic of "adjacent landowners, resources, and uses."
Collins EA at 40-41 (AR-C 0502-0503); Black Stone EA at 48-53 (AR-B 0251-0256).  Because
plaintiffs' claims focus on whether impacts on the Preserve were ignored by NPS in granting the
exemption, the Court finds no need to discuss impacts on non-park lands and resources.

NPS characterized these impacts as "short- to long-term, negligible to moderate, adverse impacts" localized around the sources.[8]  Collins EA at 37 (AR-C 0499); Black Stone EA at 48 (AR-B 0251).  These impacts are in the nature of displacement of wildlife, increase of wildlife competition in adjacent areas, and interference with the visitor experience.  Collins EA at 10, 17-18 (AR-C 0472, 0479-80); Black Stone EA at 11, 22 (AR-B 0214, 0225).  NPS found that cumulative impacts in and contiguous to the Big Sandy Creek Unit would be similar to existing noise levels without the drilling, referring to noise from existing vehicle traffic, occasional NPS-prescribed fires, commercial timber activities, and other unspecified oil and gas activities near the Unit, and thus concluded that neither the Collins nor Black Stone drilling activities would result in impairment of the natural soundscape. Collins EA at 37 (AR-C 0499); Black Stone EA at 48 (AR-B 0251).

The four Union Gas wells in the Gore/Baygall Unit of the Preserve were recognized as involving similar environmental impacts.  However, several of the impacts dismissed for the other wells were carried forward for further evaluation in the Union Gas impairment analysis, apparently due to the different attributes of the location.  NPS reached the same conclusion -- no impairment within the meaning of the Organic Act -- but its analyses of these impacts -- air quality, lightscape, and water resources -- were more detailed, having survived the scoping process.  Thus, for example, for air quality, NPS estimated that emissions of total organic compounds for each well would be 2.6 tons over a standard 30-day drilling period, and that total

---

[8]  For soundscape purposes, NPS defined the intensity of impacts as follows: "Negligible: the impact is barely detectable.  Minor: the impact is slight but detectable.  Moderate: the impact is readily apparent.  Major: the impact is severely adverse."  Collins EA at 34 (AR-C 0496); Black Stone EA at 44-45 (AR-B 0247-248).

estimated emissions would be 10.4 tons over a 90- to 120-day period.  Union Gas EA at 43 (AR-U 0466).  NPS also noted that emissions of particulate matter, nitrogen oxides, carbon monoxide, and sulfur dioxide would be greatest during the short-term drilling/completion of the wells and workover activities (one to two weeks) due to increased use of vehicles and gasoline diesel engines, but that there would be no exceedance of federal Clean Air Act standards.  Id.  If a well becomes a producing well, emissions would continue, but at unspecified lower levels.  Id.  Moreover, prevailing winds were expected to dissipate emissions from the area.  Id.  NPS then characterized the impacts from the connected surface activities as "short- to long-term, localized to widespread, negligible to moderate, and adverse,"[9] and concluded there would be no "impairment" of air quality in the Unit because "there would be no major adverse impacts" to

---

[9]  For air quality purposes, NPS defined the intensity of impacts in the Union Gas record as follows:

| | |
|---|---|
| Negligible: | Impacts would result in a change to air quality, but the change would be so slight that it would not be of any measurable or perceptible consequence, and would not affect the Preserve's designation as a Class II airshed. |
| Minor: | Impacts would result in a detectable change to air quality, but the change would be small and of little consequence, and would not affect the Preserve's designation as a Class II airshed.  Mitigation measures, if needed to offset adverse effects, would be simple and successful. |
| Moderate: | Impacts would result in a change to air quality that would be readily detectable, long-term, and localized, but would not affect the Preserve's designation as a Class II airshed.  Mitigation measures, if needed to offset adverse effects, would be extensive and likely successful. |
| Major: | Impacts would result in a change to air quality that would be severely adverse for long periods of time, and/or would affect the Preserve's designation as a Class II airshed.  Extensive mitigation measures would be needed to offset any adverse effects, and their success would not be guaranteed. |

Union Gas EA at 41 (AR-U 0464).

park resources or values whose conservation had been identified by NPS as key to the integrity of the Preserve or otherwise significant.[10] Id. at 43-44 (emphasis added).

NPS also concluded that the lightscape of the Preserve would not be impaired, providing the following additional details. Elevated light levels would be greatest during the 30-day drilling/completion period for each well because of lighting required for 24-hour operations. Union Gas EA at 51 (AR-U 0474). There would be "smaller" artificial lighting during the long-term production life of the wells and during workover periods at five- to ten-year intervals. Id. A heavily vegetated area would block "some" of the light, but the blocking effect would be limited because of the short distance between the well pads and the Preserve. Id. NPS then concluded that the surface activities would "cause short- to long-term, localized to widespread, negligible to moderate, adverse impacts to the lightscape in the analysis area," but noted "similar" impacts from nearby existing activities.[11] Id. It then concluded there would be no "impairment"

_____

[10] To use NPS's exact words, it considers whether conservation of the resource at issue is "(1) necessary to fulfill specific purposes identified in the establishing legislation of Big Thicket National Preserve; (2) key to the natural or cultural integrity of the Preserve; or (3) identified as a goal in the Preserve's general management plan or other relevant [NPS] planning documents." Union Gas EA at 44 (AR-U 0467).

[11] For lightscape impact purposes, NPS defined the intensity of impacts in the Union Gas record as follows, tracking the definitions used for air quality in some but not all respects:

Negligible:    Impacts on lightscape management would result in a change, but the change would be so slight that it would not be of any measurable or perceptible consequence.

Minor:    Impacts on lightscape management would result in a detectable change, but the change would be small and of little consequence, and would be expected to be short-term and localized. Mitigation measures, if needed to offset adverse effects, would be simple and successful.

Moderate:    Impacts on lightscape management would result in a change that would be
(continued...)

of air quality in the Unit because "there would be no major adverse impacts" to park resources or values whose conservation had been identified by NPS as key to the integrity of the Preserve or otherwise significant.  Id. at 51-52.   The Preserve's natural soundscape was found to be similarly impacted in intensity and duration based on the same pattern of activity, with the soundscape analysis largely reflecting that set forth in the Collins and Black Stone EAs, and with NPS thus reaching the same nonimpairment conclusion.  See Union Gas EA at 48-49 (AR-U 0471-72) (surface activities would have "short- to long-term, localized, negligible to moderate, adverse impacts on natural soundscapes in the Unit").

The site of the Union Gas wells gave rise to special concerns for water resources because the surface activities were located within the 100-year floodplain of the Neches River and drainage from the well pad would, for one site (Bertrand-Nelson), flow in the direction of Black Creek and then the Neches River, and for the other (the Rafferty sites), flow in the direction of a large forested wetland complex just inside the edge of the Preserve.  Mem. from Carol McCoy, Chief, Planning, Evaluation and Permitting Branch, to Dusty Pate, Superintendent, BTNP, Mar. 18, 2005 (AR-U 1041-42); Union Gas EA 54-57 (AR-U 0477-0480).  NPS recognized the risk of spills of raw petroleum product and other chemicals (motor oil, coolant, and lubricants), the

---

[11](...continued)

                    readily detectable, long-term, and localized.  Mitigation measures, if needed to offset adverse effects, could be extensive but would likely be successful.

        Major:        Impacts on lightscape management would result in a change that would have substantial consequences on a regional scale for long periods of time or to be permanent.  Extensive mitigation measures would be needed to offset any adverse effects, and their success would not be guaranteed.

Union Gas EA at 49-50 (AR-U 0473-74).

potential for pipelines to leak or rupture, and the more typical discharges of sediment and pollutants from day-to-day construction, maintenance, and production activities. Union Gas EA at 55-56 (AR-U 0479-0480).  NPS noted, however, that there was no practicable alternative of siting the operations outside of the 100-year floodplain because of the location of the subsurface targets and the broad nature of the Neches River floodplain.  Id. at 53.  It stated that the operator had proposed several mitigation measures: "In general, they include strategies to prevent and respond to accidental spills, manage storm water runoff from the disturbed sites, arrange certain components of the drilling and production facilities that have greater potential for impacts (i.e., pits and tank batteries) as far from the Unit boundary as possible, and comply with all applicable Statewide Rules regulating surface and groundwater protection."  Union Gas EA at 56-57 (AR-U 0479-80).  NPS then characterized the impacts on water resources as "short- to long-term, localized to widespread, negligible to moderate, adverse impacts," and concluded there would be no "impairment" because "there would be no major adverse impacts" on park resources or values whose conservation had been identified by NPS as key to the integrity of the Preserve or otherwise significant.  Union Gas EA at 57 (AR-U at 0480).

None of the decision documents relating to the three sites discuss the risk of catastrophic incidents, such as fire, well blow-outs, or major spills, although the Union Gas EA touches upon spills as noted above.  Other record documents -- mainly memoranda from Carol McCoy, Chief of Planning, Evaluation and Permitting Branch in the Geologic Resources Division ("GRD") to the Preserve Superintendent -- acknowledge those risks, but conclude that the risks are "low" or "very low" considering industry's diligence in using proper controls or that the risks can be addressed with additional mitigation measures.  See Mem. from McCoy to Pate, Apr. 22, 2004

(AR-C 1066) ("The 'threat of damage' to park resources from a well blowout [is] characterized as low even though 'actual damage' from a blowout could be great," noting industry's diligence in well control and available knowledge about formations.); id. at 1067 ("low probability of fire at the facility and measures in place to contain events that do occur"); Mem. from McCoy to Pate, Aug. 26, 2004 (AR-B 0519-20) ("[T]here is a potential that unplanned events, specifically releases of contaminants, will occur over the life of the operation. . . . Given the pathway of migration, sound spill prevention features, and effective spill response protocol, the Division concludes that there is a very low probability that contaminants would reach the park in any appreciable amount."); Mem. from McCoy to Pate, Mar. 18, 2005 (AR-U 1043) ("Union Gas provides a good general Spill Prevention, Control, and Countermeasure plan, but does not provide information related to flood mitigation.").

The FONSIs did not depart from the EAs in any significant respect, largely repeating the conclusions stated in the EAs, and relying heavily on the EA analyses to support those conclusions.  Collins FONSI at 1-6 (AR-C 0003-0008); Black Stone FONSI at 1-7 (AR-B 0002-0008); Union Gas FONSI at 1-9 (AR-U 0006-0014).  The response to comments attached to each FONSI reiterated that impacts from surface activities were excluded from NPS's decision to grant an exemption from the 9B regulations pursuant to 36 C.F.R. § 9.32(e), but were considered to determine the impact on the "human environment" under NEPA:

> The NPS has intentionally presented the potential impacts inside the preserve associated with the downhole activities separately from the impacts from the connected actions outside of the Preserve in the EA.  The downhole activities are analyzed to determine whether there is a significant threat to park resources and if a § 9.32(e) exemption should be granted, whereas the analysis of the impacts from the connected actions are presented in addition to the downhole operations to disclose to the public all of the potential impacts on the human environment as

> required under NEPA.  Cumulative impacts are presented for the analysis area
> which includes areas inside and outside of the preserve.

Collins FONSI at 12 (AR-C 0014); Black Stone FONSI at 23-24 (AR-B 0024-25); Union Gas

FONSI at 24-25 (AR-U 0029-30).  The Organic Act impairment determination, like the NEPA

significance determination, also was not limited to downhole activities.  Collins FONSI at 6 (AR-

C 0008); Black Stone FONSI at 6-7 (AR-B 0007-08); Union Gas FONSI at 8-9 (AR-U 0013-14).

Defendants report that the Collins well and one of the Union Gas wells have hit

commercial pay zones -- hydrocarbons in profitable quantities -- and are presently in active

production.  Decl. of Haigler Pate ¶¶ 7, 13 (Defs.' Mem. Ex. 2). The Black Stone B1 well has

been plugged and abandoned because drilling yielded no commercial pay zones, and Comstock is

reconsidering whether to drill the D1 well in light of those results.  Id. ¶¶ 9, 12.  Counsel reported

at the motions hearing that the Nelson well operated by Union Gas was plugged and abandoned

this past June.  Tr. at 16, 45.

### STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the pleadings and

the evidence demonstrate that "there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Id.  In a case involving review of a final

agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set

forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the

administrative record.  See National Wilderness Inst. v. United States Army Corps of Eng'rs,

2005 WL 691775, *7 (D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C.

1995), amended on other grounds, 967 F. Supp. 2d 6 (D.D.C. 1997).  Under the APA, it is the

role of the agency to resolve factual issues to arrive at a decision that is supported by the

administrative record, whereas "the function of the district court is to determine whether or not as

a matter of law the evidence in the administrative record permitted the agency to make the

decision it did."  See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also

Northwest Motorcycle Ass'n v. United States Dep't of Agriculture, 18 F.3d 1468, 1472 (9th Cir.

1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore,

resolution of th[e] matter does not require fact finding on behalf of this court.  Rather, the court's

review is limited to the administrative record.").  Summary judgment thus serves as the

mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review.  See Richard v.

INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25,

31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Plaintiffs challenge three final agency actions under the APA as violating the

requirements of the Organic Act and NEPA.  The APA requires that the Court "hold unlawful

and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The

"scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to

substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The court must be satisfied that the agency

has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action

including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v.

Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of

regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and

-21-

although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a

narrow one." Id. at 416. The Court's review is confined to the administrative record, subject to

limited exceptions not applicable here.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he

focal point for judicial review should be the administrative record already in existence, not some

new record made initially in the reviewing court.").

## DISCUSSION

### I.    Standing

Defendants contend that plaintiffs lack standing to challenge the three decisions to

exempt Comstock and Union Gas from the plan of operations requirement of the 9B regulations.

Defendants assert that the plaintiff associations and their members have failed to provide

adequate evidence that at least one of the individual members has satisfied the three minimum

standing elements:  injury, causation, and redressability.[12]  The Court addressed whether

plaintiffs have standing to challenge the Comstock exemption decisions at the motion to dismiss

stage of the litigation, and concluded that plaintiffs had met their burden based on the factual

allegations of the complaint, the declarations of one of plaintiffs' members, and the record

documents then submitted.  Sierra Club I, 2005 WL 3276264 at *5-8. Since that time, plaintiffs

have filed a supplemental complaint challenging the Union Gas exemption decision, and two

wells have been plugged and abandoned -- the Comstock Black Stone B1 well and the Union Gas

Nelson well.  Those wells no longer present live issues, but the exemption decisions remain in

controversy because they continue to authorize drilling of other wells -- Black Stone D1 and the

_____

[12]  The representational standing of the associations to bring suit is not otherwise in
question.  See Sierra Club I, 2005 WL 3276264 at *5 n.5.

Rafferty wells.[13]  The Court concludes, based on the expanded record, that plaintiffs have

standing to challenge the Collins, Black Stone and Union Gas exemption decisions as to the

wells that remain viable.

As the Court has previously explained, associations such as plaintiffs have

representational standing to sue if at least one of the members satisfies the "irreducible

constitutional minimum of standing":

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) "actual or imminent,
> not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the
> injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the
> challenged action of the defendant, and not . . . th[e] result [of] the independent action of
> some third party not before the court.  Third, it must be "likely," as opposed to merely
> "speculative," that the injury will be "redressed by a favorable decision."

Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and footnote

omitted)); accord Center for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir.

2005).  Harms to aesthetic and recreational enjoyment of parks are sufficient to support injury for

Article III purposes, as long as they are supported by a description of the particularized injury,

rather than general averments and conclusory allegations.  The Wilderness Soc'y v. Norton, 434

F.3d 584, 590 (D.C. Cir. 2006).  At the summary judgment stage, plaintiffs must make a factual

showing of perceptible harm, without the benefit of any presumptions in their favor based on the

allegations of the complaint.  Lujan, 504 U.S. at 566.

---

[13]  Defendants contend that the claims as to the plugged and abandoned wells should be
dismissed as moot, but as plaintiffs note, the challenged decisions authorize drilling for multiple
wells.  The Court agrees that the challenges to the three decisions are not moot as to the wells
that may still be drilled, a point that defendants do not contest.  See Summ. J. Hr'g Tr. at 45.
However, as there is no longer any controversy as to the plugged and abandoned wells, the Court
will limit its consideration of the record to the facts relevant to the remaining viable wells --
Collins, Black Stone D1, and the three Union Gas Rafferty wells.

Defendants contend that plaintiffs have failed to make a factual showing that they use and enjoy the specific areas that are impacted by the wells at issue, noting that the sites are located near remote areas of the Preserve that are rarely used by visitors.  Defs.' Mem. at 16.  This contention merits little discussion.  The unrebutted declarations submitted in support of plaintiffs' standing establish with specificity that two of plaintiffs' members regularly use areas that are "within a half mile" of each of the wells, and that both the noise from the drilling activities and visual obstructions interfere with their enjoyment of the Preserve by causing animals to disperse, disturbing the quiet enjoyment of the park, and disrupting the visual landscape.[14]  See Pls.' Mem. Ex. 13 (Second Decl. of Brandt Mannchen ¶¶ 5-12) ("Second Mannchen Decl."); Pls.' Mem. Ex. 14 (Decl. of Maxine Johnston ¶¶ 5, 8, 18) ("Johnston Decl.").  Thus, unlike plaintiffs who lack standing because they attest to using only "unspecified portions of an immense tract of territory," Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990), plaintiffs here have attested to their present and continued use of specific areas in close proximity to the wells and to areas that are directly affected by the wells.

Defendants contend that plaintiffs nonetheless lack the requisite injury because they have produced no evidence that surface drilling activities would "impair" their enjoyment of the Preserve and the administrative record shows that the risk of harm to Park resources is "low" or

_____

[14]  With respect to the exact locations of his use of the Preserve in relation to the wells, Mannchen states: "The Blackstone B1 and D1 wells and the Collins well, are all adjacent to the Big Sandy Creek Unit, and are approximately a half mile from where I hike along Big Sandy Creek.  I saw one of these wells from the Preserve on at least one occasion."  Second Mannchen Decl. ¶ 8.  "The Union Gas Rafferty #1, 2, and 3 wells are less than half a mile away from . . . the Franklin Lake area," another area he visits in the Preserve.  Id. ¶ 9.  The drilling activities are visible and audible from the Preserve.  Id. ¶¶ 9-12.  Johnston's declaration states: "I have routinely hiked and canoed in areas of Big Thicket, and plan to continue visiting areas, that are within half a mile of the proposed wells."  Johnston Decl. ¶ 18.

-24-

"very low."  Defs.' Mem. at 17.  Defendants err in conflating an "impairment" of park resources

within the meaning of the Organic Act -- a threshold subject to NPS interpretation[15] -- with the

degree and likelihood of injury that is required to support Article III standing.  As discussed in

Sierra Club I, to establish standing in support of a procedural rights claim, such as the NEPA and

Organic Act claims here, a plaintiff must show the procedural insufficiency has "demonstrably

increased [the] risk of serious environmental harm" that "actually threatens the plaintiff's

particular interests."  Sierra Club I, 2005 WL 3276264 at *6 (quoting Florida Audubon Soc'y v.

Bentsen, 94 F.3d 658, 667 (D.C. Cir. 1996) (en banc)).  Plaintiffs' declarations and the

administrative record demonstrate that there is not only an increase in risk, but that some of the

environmental impacts of concern are, in fact, projected by NPS to occur and have actually

materialized at the wells that have been drilled, including dispersion of wildlife and disruption of

the natural soundscape.  See Second Mannchen Decl. ¶¶ 8, 10-12; Collins EA at 10, 17-18 (AR-

C 0472, 0479-0480); Blackstone EA at 11, 22 (AR-B 0214, 0225); Union Gas EA at 48 (AR-U

0471).   NPS's conclusions that these types of impacts are not an "impairment" from an NPS

resource perspective -- one of the merits issues in this case -- does not eliminate the impacts from

the standing inquiry.

Moreover, the increased risk of wildfires from the drilling projects further evidences a

concrete injury to plaintiffs' particularized interest in using the affected areas.  As discussed in

the Court's earlier standing discussion:  "Mountain States Legal Found. v. FERC, 92 F.3d 1228,

1234 (D.C. Cir. 1996), recognizes that wildfires fall in that category of environmental harms that

---

[15]  Under NPS's approach, "not all impacts are impairments," depending upon, among
other things, the severity and duration of the impact and the types of resources affected.  See,
e.g., Collins EA at 4 (AR-C 0466).

are, by their nature, 'probabilistic,' but that nonetheless may be sufficient 'to take a suit out of the category of the hypothetical -- provided that the relief sought would, if granted, reduce the probability.'" Sierra Club I, 2005 WL 3276264 at * 8.   The Court of Appeals has recently reiterated that probabilistic injuries may support standing under this standard.   NRDC v. EPA, -- F.3d --, 2006 WL 2472144 at *3-4 (D.C. Cir. Aug. 29, 2006).  Defendants nonetheless contend that, on the expanded record, the evidence demonstrates that the risk of harm from wildfires is too remote and speculative to support injury-in-fact because the incidence of fire from wells in the relevant area has historically been very low.  Defs.' Mem. at 17-19.  Defendants submit the declaration of an NPS petroleum engineer to demonstrate that, over the past 40 years, there have been only 46 reported fires associated with oil and gas operations in the oil and gas regulatory district ("District 3") covering the Preserve area.  Defs.' Mem. Ex. 1 (Decl. of Pat O'Dell ¶ 9-12, 22-23).  NPS calculates the average number of producing oil and gas wells to be 11,000 annually, and thus estimates that the annual incidence of fire as 1.15 fires per year, or 1 in 10,000 wells per year.  Id. ¶¶ 24-25.  On a purely quantitative level, the Court concludes that a risk of fire of 1 in 10,000 wells per year would qualify as a "non-trivial" risk sufficient to take the risk out of the category of the hypothetical.  See NRDC, -- F.3d --, 2006 WL 2472144 at *4 (holding that, "if a quantitative approach is appropriate," standing exists where parties projected that regulatory action would result in an increase in an individual's lifetime risk of nonfatal skin cancer of about 1 in 200,000).

One also can assess the increase in risk by applying simple logic to conclude that the challenged actions result in a nontrivial increase in the risk of wildfires. See Mountain States Legal Found., 92 F.3d at 1234-35 (considering whether the "source of risk" was "logically"

connected to the agency action to determine whether increase in risk was sufficient injury).  Here, NPS allegedly excluded the risk of fire hazards associated with the surface activities from its exemption decision under section 9.32(e), and thus the exemption was granted without regard to those risks and precluded the development of a plan of operations that could provide safeguards against such risks.  NPS's failure to establish fire prevention safeguards as a condition of access -- assuming for the moment NPS can be required to do so[16] -- would appreciably increase the risk of fire in a nontrivial manner, even though a number cannot be attached to such reduction.  See NRDC, --- F.3d at ----, slip op. at 9 (reiterating that the relevant variations in risk must be "nontrivial" and "sufficient to take a case out of the hypothetical") (citations and quotations omitted).[17]

---

[16]  Defendants contend that NPS does not have authority under the 9B regulation to impose such conditions upon access, but the Court must assume that a plaintiff will prove its substantive legal claim in evaluating standing.  See Catholic Social Serv., Inc. v. Shalala, 12 F.3d 1123, 1126 (D.C. Cir. 1994) ("one must assume the validity of a plaintiff's substantive claim at the standing inquiry").  Here, plaintiffs' claim is that, in granting operators access to a park, NPS has a duty to prevent impairment of park resources from nearby fire hazards (as well as other threats).  Such safeguards could include a description of "potential hazards to persons or the environment . . . , along with plans for mitigation of such hazards" and of "reasonable steps to prevent and . . . remove accumulations of oil or other materials deemed to be fire hazards."  36 C.F.R. §§ 9.36(a)(10)-(11), 9.41(f).

[17]  Plaintiffs also refer to other catastrophic events including oil and gas spills and well blowouts (an uncontrolled escape of formation fluids from a well).  The O'Dell declaration describes the numbers of such events as "low," but as noted above, that NPS characterization for Organic Act purposes has little meaning for the standing inquiry.  For calendar year 2004, there were a total of 58 reportable spills (i.e., exceeding five barrels) in District 3, with 11 of those spills exceeding 20 barrels of oil.  O'Dell Decl. ¶¶ 16-17.  O'Dell thus calculates the spill occurrence rate as 5 reportable spills per 1,000 wells.  Id. ¶ 18.  As to well blowouts, O'Dell calculates the blowout rate based on worldwide data as 1 blowout for every 10,000 wells drilled.  Id. ¶¶ 29-30.  The incremental risk of a spill or blowout for an exempted directional drilling project also would be sufficient to confer standing, applying the same analysis as above.

With respect to causation, plaintiffs' injuries are linked to NPS's actions in a straightforward causal chain:  NPS's exclusion of impacts from adjacent surface activities results in authorizations to drill pursuant to 36 C.F.R. § 9.32(e) without regard to the threat of harm from the nearby surface activities.  Those drilling activities directly caused the alleged harms described above.

Defendants contend that, even if this is so, plaintiffs have failed to demonstrate redressability and that NPS has no authority under the 9B regulations to prevent or mitigate impacts outside park boundaries, which it contends is conclusively established by Sierra Club I. Defs.' Mem. at 13-16.  In other words, even if the challenged actions are remanded to NPS, the agency asserts that it could take no action under the 9B regulations to protect the Preserve from threats from adjacent surface activities.  This misses the crux of plaintiffs' remaining claims:  that the three site-specific exemptions are contrary to the Organic Act and NEPA, notwithstanding the text of the 9B regulations, an issue not addressed in Sierra Club I.[18]  See Am. Compl. ¶¶ 55, 58; Supp. Compl. ¶¶ 10, 15.  As recently noted in The Wilderness Soc'y, 434 F.3d at 590, "the redressability inquiry poses a simple question: '[I]f plaintiffs secured the relief they sought, . . . would [it] redress their injury?"  Id.  Here, the relief sought by plaintiffs is to set aside the exemption decisions based on a judicial determination that the exclusion of impacts from surface activities under section 9.32(e) is contrary to the nonimpairment mandate of the Organic Act. See Am. Compl. at 20; Supp. Compl. at 5.  This relief would redress plaintiffs' injuries because

---

[18]  Sierra Club I construed section 9.32(e) solely for the purpose of determining whether a guidance document issued decades after promulgation of section 9.32(e) established new legal obligations and thus gave rise to a final agency action.  The Court expressed no opinion on the consistency of the regulation with the Organic Act.

the operators would no longer have NPS authorization to gain access to the oil and gas through federal lands unless NPS and the operator implemented conditions, or found some other solution, that would satisfy the Organic Act nonimpairment mandate -- regardless of what the 9B regulations provide.   Hence, in summary, the Court concludes that plaintiffs have standing to bring their claims because they have demonstrated injury to their members' aesthetic and recreational enjoyment of the Preserve, defendants caused those injuries, and plaintiffs' injuries are redressable by the relief requested.

**II.      The National Park Service Organic Act**

The crux of plaintiffs' claim under the Organic Act is that NPS disregarded its statutory duty to prevent impairment of park resources and values by issuing each of the three FONSI and exemption decisions "without considering whether the surface activities pose a threat to Park resources" (Am. Compl. ¶ 55; Suppl. Compl. ¶ 10).   Plaintiffs contend that section 9.32(e) -- which excludes surface activities outside of park boundaries from the exemption standards -- cannot support the decisions because the regulation is not consistent with the Organic Act, and should be declared arbitrary and capricious as applied in these decisions.   In response, defendants acknowledge that the section 9.32(e) exemption decisions excluded consideration of impacts from surface activities, but contend that the decisions are in compliance with the Organic Act because they were accompanied by "impairment determinations" and FONSIs that contained an explanation of the impacts from surface activities, and reasonably concluded that the drilling activities (both within and outside the Preserve) would not impair park resources or values.

**A.      Status of Impacts from Surface Activities in the NPS Decisionmaking Process**

Before exploring the merits of the decisions, it is necessary to address a fundamental disagreement between the parties as to what the administrative record says about impacts from

surface activities.  Plaintiffs vehemently disagree that NPS made an assessment of whether

impacts from surface activities could impair park resources under the Organic Act.  <u>See</u> Pls.'

Mem. at 31 ("this case turns on . . . whether, in making its decision, [NPS] can opt to <u>ignore</u> -- as

it has done -- the admitted impacts and risks that the surface operations outside the Park unit pose

to Park resources"); Pls.' Reply Mem. at 17-24, 31 (disagreeing with defendants' "post hoc"

contention that surface impacts were considered to determine whether park resources would be

impaired; "the Administrative Record does not reflect a separate agency 'impairment

determination' that considers the surface impacts of the drilling operations").  Defendants

contend that "the record demonstrates that the agency analyzed the impacts of surface activities

outside of park boundaries on park resources in each EA and took that analysis into account

when rendering each impairment determination and FONSI."  Defs.' Mem. at 25; <u>see also</u> Defs.'

Reply at 7-14 (discussing NPS's "separate determination concerning impairment" under the

Organic Act in the decision documents).

        The Court has discussed those decision documents in the background section above, and

it is readily apparent from the Court's review of those documents that, contrary to plaintiffs'

characterization, NPS did consider impacts on the Preserve from surface activities outside the

Preserve to determine whether those activities would impair park resources or values within the

meaning of the Organic Act.  First, plaintiffs' contention that the administrative record does not

reflect a separate "impairment determination" by the agency is directly contradicted by the EAs.

For each decision, the EAs state that, pursuant to the statutory provisions prohibiting an

impairment of park resources and values, "Section 3 provides an analysis of the potential

impairment for each park resource or value carried forward for further evaluation." Collins EA at 4 (AR-C 0466); Black Stone EA at 5 (AR-B 0208); Union Gas EA at 6 (AR-U 0429).

More significantly, those impairment determinations (which also serve as the agency's NEPA analysis), and the scoping analyses that preceded them, discuss a broad range of impacts from surface activities adjacent to the Preserve boundaries. The wellpads -- the primary site of the surface activities -- are located 100 to 500 feet outside of the Preserve, and the impacts from activities occurring at the wellpad -- primarily construction, day-to-day production activities, vehicle traffic, lighting, and heavy machinery -- are the main subject of the analysis in the scoping analyses and impairment determinations. See, e.g., Collins EA at 9-21, 33-37 (AR-C 0471-0483, 0495-0499); Black Stone EA at 10-25, 43-48 (AR-B 0213-0228, 0246-0251); Union Gas EA at 11-24, 39-57 (AR-U 0434-0447, 0462-0480). NPS's consideration of surface activities is also quite clear from its statement that it considered the impacts from "connected actions," which it defined as actions "occurring outside of the park related to the directional drilling operation inside the park includ[ing] the construction of the well/production pad(s), gas sales/transportation line, and access road; drilling and completion; hydrocarbon production and transportation; and well plugging and surface reclamation." See, e.g., Collins EA at 8 (AR-C 0470); Black Stone EA at 9 (AR-B 0212); Union Gas EA at 10 (AR-U 0433). Additionally, the analysis area for evaluating impacts was defined in each EA to include "the indirect area of impact," extending 1,500 feet beyond each wellsite,[19] and for cumulative impacts NPS included

---

[19] NPS selected 1,500 feet because it determined that noise generated during drilling activities may require up to 1,500 feet to attenuate to normal background levels. See Union Gas EA at 2 (AR-U 0425).

the entire Preserve Unit at issue and areas contiguous to the Unit.   Collins EA at 1 (AR-C 0463);

Black Stone EA at 2 (AR-B 0204); Union Gas EA at 2 (AR-U 0425).

Plaintiffs suggest, in the alternative, that any such impairment determinations should not

be considered because only the exemption decisions under section 9.32(e) -- and no other

"separate decisions" -- are supported by the administrative records.  Pls.' Reply Mem. at 19-20.

The problem with plaintiffs' position is that it attempts to exclude significant portions of the

records and fails to recognize NPS's full process for meeting its obligations under the Organic

Act.  Plaintiffs' argument is based on the false premise that NPS undertakes no other analyses,

besides evaluating impacts from downhole activities within the Preserve, before granting an

operator an exemption under section 9.32(e).  However, NPS has recognized that it has a distinct

duty under the Organic Act to regulate the use of parks in a manner that will protect park

resources from impairment.  Collins EA at 3-4 (AR-C 0465-0466); Black Stone EA at 4-5 (AR-B

0207-0208); Union Gas EA at 4-6 (AR-U 0427-0429).  Thus, NPS has, in the records supporting

these decisions, engaged in two different analyses before determining that an operator can be

exempted from a 9B plan of operations consistent with the Organic Act: (1) it considers whether

the operations within the Preserve pose a significant threat of damage to park resources under

section 9.32(e); and (2) it considers, more broadly, whether any of the activities associated with

the drilling -- both the in-park operations and connected actions outside of the Unit -- would

impair park resources within the meaning of the Organic Act.  This is not a "post hoc"

rationalization -- it is explicit on the face of the record:

> The NPS evaluates project-specific directional drilling applications on a case-by-
> case basis by applying a variety of Current Legal and Policy Requirements prior to
> issuing an exemption under § 9.32(e) of the NPS Nonfederal Oil and Gas Rights
> Regulation (36 CFR 9B).  The following discussion is a summary of the basic

management direction the NPS follows for exempting directional drilling proposals that qualify under the § 9.32(e) provision:

1.2.1.  NPS Organic Act and General Authorities Act -- Prevention of Impairment

* * *

1.2.2.  Big Thicket National Preserve Enabling Legislation

* * *

1.2.3.  NPS Nonfederal Oil and Gas Regulations, 36 CFR 9B

* * *

1.2.5.  NPS Monitoring of Nonfederal Oil and Gas Operations

* * *

1.2.6.  National Environmental Policy Act of 1969

* * *

Union Gas EA at 4-11 (AR-U 0427-0434) (emphasis added); see Collins EA at 3-8 (AR-C 0465-0471) (substantially the same discussion); Black Stone EA at 4-9 (AR-B 0207-0212) (substantially the same discussion).  NPS discusses at length both its duty to prevent impairment of park resources and values under the Organic Act and related statutes and its obligations under 36 CFR 9B (including section 9.32(e)), as well as its NEPA obligations.  In other words, the exemption decision under section 9.32(e) cannot be divorced from the remainder of the record because qualifying for an exemption under section 9.32(e) is only one part of an exemption decision.  There is an additional step -- the accompanying impairment determination -- that is a nonseverable part of the decision.  As counsel stated at the motions hearing, "it would be a violation of the Organic Act for us to permit something that would impair park resources."  Tr. at 33-34.

To the extent plaintiffs challenge the validity of section 9.32(e) under the Organic Act, the Court finds it unnecessary and inappropriate to make any broad rulings in that regard.  The

three administrative records submitted for judicial review make abundantly clear that NPS did, in fact, consider impacts from the operators' surface activities on park resources or values pursuant to its statutory duty under 16 U.S.C. § 1.  The parties filed cross-motions for summary judgment based on those records, and did not brief the issue of the validity of section 9.32(e) under the Organic Act.  Only after the motions hearing, and at the request of the Court, did the parties submit limited briefing on that issue, and those briefs highlight the importance of determining whether the records in this case, as a factual matter, show an impact or impairment caused by surface activities.  See Defs.' Suppl. Mem. at 6-9; Pls.' Suppl. Mem. at 6-8.  Thus, although there is no time bar to mounting a challenge to the regulation as applied,[20] the administrative records here present no occasion to consider that type of challenge because the records demonstrate that NPS considered impacts from surface activities to determine whether park resources or values would be impaired within the meaning of the Organic Act -- leaving only the question whether the agency's analysis and conclusions were reasonable.  It would be improvident under these circumstances to decide whether section 9.32(e) is invalid under the Organic Act for excluding impacts from surface activities.  The Court will thus limit its review to the claim as presented -- whether NPS's exemption decisions and FONSIs are consistent with the nonimpairment mandate of the Organic Act based on the administrative records.

---

[20]  See, e.g., Cellular Telecomm. & Internet Ass'n v. FCC, 330 F.3d 502, 508 (D.C. Cir. 2003) (noting that "the court will entertain challenges beyond a statutory time limit to the authority of an agency to promulgate a regulation . . . following enforcement of the disputed regulation"); Dunn-McCampbell Royalty Interest, Inc. v. NPS, 112 F.3d 1283, 1287 (5th Cir. 1997) ("an agency's application of a rule to a party creates a new, six-year cause of action to challenge . . . the agency's constitutional or statutory authority).

### B.       Merits of the NPS Decisions

Plaintiffs contend that the administrative records demonstrate that the surface activities pose serious threats to park resources, and that, to the extent NPS considered the threats at all, its decisions were arbitrary and capricious, and little more than "make-work."  Pls.' Mem. at 22-26; Pls.' Reply Mem. at 20.  Defendants respond that each record demonstrates that NPS appropriately considered whether surface activities from directional drilling posed a threat to the Preserve and, in each case, NPS reasonably determined that they would not impair park resources.  Defs.' Mem. at 24-31; Defs.' Reply Mem. at 10-14.

Plaintiffs cite a number of impacts upon the Preserve in support of their position, which are referenced in the factual background set forth above.  The footprint of each well extends within 100 feet of the Preserve boundary (but 515 feet for the Black Stone D1 well), and thus, air emissions, noise, and drilling activities in plain sight of the Preserve will be experienced by visitors to the Preserve.  Pls.' Mem. at 22-23 (citing AR-C 1066-67; AR-B 509-11; AR-U 1042).  Wildlife also will be negatively impacted by the noise and other disturbances from the drilling activities, as well as any potential releases of hazardous substances.  Id. at 23 (citing AR-C 0480; AR-B 215; AR-U 439).  The surface activities also threaten water resources -- in particular, the Black Stone D1 and Union Gas Rafferty wells, which drain in the direction of wetlands or waterways that flow into nearby rivers within the Preserve.  Id. at 23-24 (citing AR-B 532-33; AR-B 557; AR-U 1189).  Plaintiffs further note that NPS recognized the potential for catastrophic, adverse effects on the Preserve as a result of a serious fire, blowout or spill.  Id. (citing AR-C 1066-67; AR-B 509; AR-U 1042).

NPS mounts a two-tiered defense of its impairment determination:  first, NPS argues that it can only encourage operators to adopt voluntary mitigation measures to minimize impacts on

park resources and values from surface activities because of a lack of jurisdiction over activities outside the Preserve, and that operators have, in fact, agreed to implement mitigation measures; and second, NPS argues that the impacts described do not rise to the level of "impairment" of park resources and values.   The first point does not advance the analysis, however, because the issue is not the reasonableness of voluntary mitigation measures in light of limitations on NPS's jurisdiction, but whether the directional drilling activities -- as approved by NPS through an exemption from the 9B regulations -- will result in an impairment of park resources and values under the Organic Act, notwithstanding section 9.32(e).[21]   Furthermore, questions as to NPS's jurisdiction over activities outside the Preserve are irrelevant to the impairment analysis because, as plaintiffs correctly note (Pls.' Mem. at 30-31), the issue is not whether NPS may regulate those activities, but whether in authorizing a private party to drill beneath the Preserve NPS has reasonably determined, consistent with the Organic Act nonimpairment mandate, that the drilling activities, including those at the surface, will not impair park resources and values.[22]   Thus, the real task at hand is to determine whether NPS's conclusions that surface activities will not impair park resources or values is reasonable.

---

[21]   If anything, the voluntary nature of mitigation measures undermines the reasonableness of NPS's conclusions regarding nonimpairment, because an operator would not be legally bound to implement such measures.

[22]   Defendants also go astray insofar as they argue that nonimpairment findings are supported by NPS's right to recover response costs and damages on a strict liability basis under 16 U.S.C. § 19jj from those who injure park system resources.  Defs.' Mem. at 26 -27.  The recovery of response costs and damages after park resources are injured reveals nothing about the likely extent of projected resource damage.  Indeed, if that were relevant, no impacts would rise to the level of impairment because NPS could always obtain monetary recovery.

NPS first emphasizes that not all impacts are impairments. Collins EA at 4 (AR-C 0466);

Black Stone EA at 5 (AR-B 0208); Union Gas EA at 4 (AR-C 0428). NPS has defined

impairment as follows:

> An impairment is an impact that, in the professional judgment of the responsible
> NPS manager, would harm the integrity of park resources or values, including the
> opportunities that otherwise would be present for the enjoyment of those resources
> or values.  Whether an impact meets this definition depends on the particular
> resources and values that would be affected; the severity, duration, and timing of
> the impact; the direct and indirect effects of the impact; and the cumulative effects
> of the impact in question and other impacts.  The NPS Management Policies
> explain that an impact would be <u>more likely</u> to constitute an impairment to the
> extent that it affects a resource or value whose conservation is:
>    1) necessary to fulfill a specific purpose identified in the establishing
>       legislation or proclamation of the park,
>    2) key to the natural or cultural integrity of the park or to opportunities for
>       enjoyment of the park, or
>    3) [i]dentif[ied] as a goal in the park's general management plan or other
>       relevant NPS planning documents.
> An impact would be <u>less likely</u> to constitute an impairment to the extent that it is an
> unavoidable result, which cannot reasonably be further mitigated, of an action necessary
> to preserve or restore park resources or values.

Collins EA at 4 (AR-C 0466) (emphasis in original); Black Stone EA at 5 (AR-B 0208); Union

Gas EA at 5 (AR-U 0428); <u>see also</u> NPS Management Policies 1.4.5 (Pls.' Ex. 1).  This

interpretation of the nonimpairment mandate is not challenged by plaintiffs.

NPS relies primarily on the EAs and FONSIs, as well as memoranda from its Geologic

Resources Division (the "McCoy memos") recommending granting the exemptions, to support

the conclusions that there would be no impairment from surface activities outside the Preserve.

The EAs and the FONSIs describe the impacts from surface activities, typically noting whether

the impact is short- or long-term, localized or widespread, and the intensity of the impact --

negligible, minor, moderate, or major.  <u>Supra</u> 11-20.   None of the impacts were considered

"major," which NPS defines as "severely adverse." <u>See</u>, <u>e.g.</u>, Collins EA at 34 (AR-C 0496);

Union Gas EA at 41 (AR-U 0464). Thus, for example, impacts on the soundscapes were described as "localized, short-term, minor to moderate adverse impacts," and impacts on air quality as "localized, short- to long-term, negligible to minor, adverse impacts."  Collins EA at 14, 37 (AR-C 0476, 0499); Black Stone EA at 15-16, 48 (AR-B 0218-19, 0251); Union Gas EA at 43, 48-49 (AR-U 0466, 0471-72) (but describing intensity of air quality impact as "negligible to moderate" and potentially "widespread").  After each description, NPS summarily stated its conclusion that there would be "[n]o impairment" to the resource or value examined. Collins EA at 37 (AR-C 0499); Black Stone EA at 48 (AR-B 0251); Union Gas EA at 44, 49, 52, 57 (AR-U 0467, 0472, 0475, 0480).  The McCoy memos, like the EAs and FONSIs, summarily acknowledge that there will be impacts from air emissions, noise, and lighting that will be greatest during drilling operations, and also discuss in greater detail the surface casing and cementing program relative to the protection of usable quality aquifers.  AR-C 1065-67; AR-B 0514-0521; AR-U 1042-44.  The memos conclude that surface activities outside the Preserve associated with the Collins and Black Stone wells present a "low level" threat of damage to Preserve resources, and a "very low probability" of large spills.  AR-C 1065-67; AR-B 0514-0521; cf. AR-U 1042-44 (recommending additional information and gathering and mitigation measures in order to support conclusion that spills in the floodplain area would not adversely impact wetlands).

The problem with these conclusions is that there is little or no explanation of how NPS reached them.  The Court recognizes that "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate."  Davis v. Latschar, 202 F.3d 359, 365 (D.C. Cir. 2000); see also Edmond Inst. v. Babbitt, 42 F. Supp. 2d 1, 15 (D.D.C. 1998) (section 1 of the Organic Act "gives the Park

Service 'broad, but not unlimited discretion in determining what actions are best calculated to protect Park resources'") (quoting Daingerfield Island Protective Soc'y v. Babbitt, 40 F.3d 442, 446 (D.C. Cir. 1994)).  But like any other agency, "[t]o survive review under the arbitrary and capricious standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).  Merely describing an impact and stating a conclusion of nonimpairment is insufficient, for this merely sets forth "the facts found" and "the choice made," without revealing the "rational connection" -- the agency's rationale for finding that the impact described is not impairment.  As NPS notes in each decision, "[w]hether an impact meets this [impairment] definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." Collins EA at 4 (AR-C 0466); Black Stone EA at 5 (AR-B 0208); Union Gas EA at 5 (AR-U 0428).  But it is just that assessment that is lacking here.  Any reasoned explanation must set forth which of those factors were significant in leading NPS to conclude that an impact is not an impairment -- or that a group of impacts collectively is not an impairment.  For example, NPS's statement that an impairment "depends on the particular resources and values that would be affected" suggests that some park resources and values may be more significant than others in an impairment inquiry, and thus perhaps a major impact on one lower-valued resource might be acceptable, whereas a moderate or even minor impact on an essential resource would weigh more heavily in favor of finding an impairment.  But nothing in the administrative records reveals how this factor was considered.  Moreover, the recognition by NPS that the duration of the impact matters

suggests that a long-term impact -- defined as one lasting over three years -- would have some bearing on the impairment analysis. But the records do not explain why those impacts described as potentially long-term -- air pollution, noise pollution, disruption of the lightscape from artificial lighting, and contamination of water resources -- do not result in impairments.

NPS's descriptors of the impacts are wholly uninformative. For the Collins and Black Stone decisions, the terms "negligible," "minor," "moderate," and "major" are not defined, except with regard to soundscape.[23]  Collins EA at 34 (AR-C 0496); Black Stone EA at 44-45 (AR- B 0247-48). One is tempted to presume that the definitions used for soundscape should be applied to the other categories of impacts -- air quality, lightscape, and water -- but the Court is not free to supply explanations that are not in the record, and in any event, the Union Gas EA defined the terms somewhat differently for the other categories, suggesting that such a presumption might be erroneous. See Union Gas EA at 41, 49-50 (AR-U 0464, 0473-74).

---

[23]  For example, after describing the sources of air pollution and types of pollutants emitted from surface activities, NPS simply made a conclusory unquantified statement about the air quality:

> Impacts would be greatest during the 45-day drilling phase, resulting in negligible to minor adverse effects on air quality in the Unit, localized near the wellsite. If the well is placed in production, emissions would continue but at reduced levels, with localized, long-term, negligible, adverse impacts on air quality in the Unit. Because there would be no impacts [on the] Unit's air quality from in-park oil and gas operations; and impacts [on] the Unit's air quality from connected actions would be at low intensity levels, with localized, short- to long-term, negligible to minor adverse impacts; air quality in the Unit was dismissed from further analysis in the EA.

Collins EA at 14 (AR-C 0476); see Black Stone EA at 16 (AR- B 0219) (reciting substantially the same characterization of air quality impacts). At other times, NPS did not even use the labels. For example, NPS provides virtually no information on how artificial lighting is expected to affect wildlife in the Collins area, only equivocating that "[t]here could be beneficial or adverse effects on wildlife in the vicinity of the wellpad." Collins EA at 14 (AR-C 0476).

An unbounded term cannot suffice to support an agency's decision because it provides no objective standard for determining what kind of differential makes one impact more or less significant than another.  See Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 437 F.3d 75, 81 (D.C. Cir. 2006) (rejecting an agency's characterization of a chemical reaction as "much faster" than another as an insufficient explanation "because it says nothing about what kind of differential makes one . . . 'much faster' than another. Ten millimeters per second?  A hundred? A thousand?").  Assigning labels to impacts -- for example, that the air pollution impact at the Union Gas Rafferty sites may reach the "moderate" level -- provides the Court with no basis to determine first, whether NPS reasonably concluded that the impact is "moderate," and second, whether NPS reasonably concluded that a "moderate" impact should not, under the relevant circumstances, be considered an impairment.

Even the definitions used in the Union Gas record provide little substance.  A "minor" impact on air quality, lightscape, and water resources is one that is "detectable," "small and of little consequence," and "short-term and localized,"  while a "moderate" impact is "readily detectable, long-term, and localized," and a "major" impact is one with "substantial consequences on a regional scale for long periods of time" or something "severely adverse." Supra notes 8-11. The definitions, while bounding the agency's discretion in some regards, such as duration and area of impact, still leave identifying the intensity of the impact -- small, substantial, or somewhere in between -- entirely up to the agency.  For example, the record indicates that emissions of total organic compounds for the Union Gas wells is estimated to be 2.6 tons during a 30-day standard drilling operation for a single well and some unspecified lower level of emissions over the life of the wells.  Union Gas EA at 42-43 (AR-U 0465-66).  It then describes

these and other vehicle and equipment emissions as "negligible to moderate," with the

"moderate" apparently applying to the peak emissions over the drilling period.  Id.  For the

Collins well, total organic emissions is estimated to be 5.4 tons over a 60 day standard drilling

operation, and for Black Stone, the estimate is 7.1 tons per well during a standard drilling

operation of 80 days -- and these are labeled "minor."  Collins EA at 40 (AR-C 0502); Black

Stone EA at 51 (AR-B -254).  The Court can identify no principled basis for calling one "minor"

and one "moderate," or declining to call any given impact "major" -- only the application of a

conclusory label.

The indeterminate and conclusory nature of the labels is also apparent in NPS's

discussion of impacts on water resources.  The Union Gas surface activities at the Rafferty site

are located in the 100-year floodplain of the Neches River, and discharges will flow in the

direction of a large forested wetland complex just inside the edge of the Preserve.  Union Gas EA

at 53 (AR-U 0476).  NPS described in detail several risks from these wells including spillage of

raw petroleum products, the construction of two pipeline corridors, leaks from pipelines, and

discharges from pipeline maintenance, but stated that it considered the risks minimized by the

mitigation measures proposed:

> In general, they include strategies to prevent and respond to accidental spills,
> manage storm water runoff from the disturbed sites, arrange certain components
> of the drilling and production facilities that have greater potential for impacts (i.e.,
> pits and tank batteries) as far from the Unit boundary as possible, and comply with
> all applicable Statewide Rules regulating surface and groundwater protection.

Union Gas EA at 56 (AR-U 0479).  NPS then notes the presence of an 80-100 foot buffer of

vegetation between the surface activities and the Preserve, and with nothing more, draws the

conclusion that the impact on water resources would be "short- to long-term, localized to

widespread, negligible to moderate, [and] adverse."[24]  Id. at 57 (AR-U 0480).  Under this

approach, any listing of mitigation measures -- even voluntary measures -- and the presence of a

buffer zone could be deemed by NPS to be sufficient to reduce impacts to an acceptable level

because there is no explanation in support of that conclusion.[25]

        The use of conclusory labels is carried through to the ultimate conclusions of

nonimpairment.  These are set forth tersely and without explanation in the Black Stone and

Collins EAs and FONSIs.[26]  With respect to the Union Gas wells, NPS recites the following

lengthier conclusion, repeated at the end of each description of impacts on air, soundscape, light,

and water resources:

> Because there would be no *major* adverse impacts to air quality [or some other
> value] whose conservation is (1) necessary to fulfill specific purposes identified in
> the establishing legislation for Big Thicket National Preserve; (2) key to the
> natural or cultural integrity of the Preserve; or (3) identified as a goal in the
> Preserve's general management plan or other [NPS] planning documents, selection
> of Alternative B [drilling with exemption] would not result in an impairment . . .

 Union Gas EA at 44 (air) (emphasis added), 49 (soundscape), 52 (lightscape), 57 (water) (AR-U

0467, 0472, 0475, 0480).  But this somewhat longer conclusion -- one that largely parrots the

---

[24] It is worth noting here that NPS has concluded that a potentially long-term, widespread,
moderate adverse impact on water resources is not an impairment. Just why that is so is not clear.

[25] One would also expect NPS to provide information as to the effectiveness of
mitigation measures at other directional drilling sites around the Preserve or other parks, given
the history of directional drilling at the Preserve, or, if the measures are new, some explanation of
why they would be expected to be effective.

[26] See, e.g., Collins EA at 37 (AR-C 0499) ("[n]o impairment to natural soundscape
would result"); Collins FONSI at 6 (AR-C 0008) ("NPS has determined that implementation of
the preferred alternative would not constitute an impairment to the integrity of Big Thicket
National Preserve resources or values as described by NPS Management Policies (NPS 2001, §
1.4)."); Black Stone EA at 48 (AR-B 0251) (("[n]o impairment to natural soundscape would
result"); Black Stone EA at 6 (AR-B 0006-7) ("NPS has determined that implementation of the
preferred alternative would not constitute an impairment to the integrity of Big Thicket National
Preserve resources or values as described by NPS Management Policies (NPS 2001, § 1.4).").

definition of impairment as set forth in the NPS Management Policies -- reveals no more of the rationale behind NPS's decisionmaking than the other terse statements of "no impairment."[27] The Court will not defer to the agency's conclusory or unsupported assertions. See McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

Accordingly, the Court holds that, as to each of the decisions granting the operators' applications to directionally drill wells beneath the Preserve pursuant to section 9.32(e), NPS failed adequately to explain its conclusion that impacts from nearby surface drilling activities would not result in an impairment of park resources and values. Those decisions are therefore arbitrary and capricious under the APA. It may be the case that NPS can adequately explain its conclusions, and the disruption to the existing drilling activities would be unwarranted in such a circumstance. Therefore, the Court will remand the decisions to NPS for further explanation, rather than setting the decisions aside. See MCI Telecomm. Corp. v. FCC, 143 F.3d 606, 609 (D.C. Cir. 1998) (exercising discretion to remand agency action without vacating it where the flaw is inadequate explanation).

---

[27] The boilerplate NPS statement on impairment implies that an impact must be "major" to be considered an impairment of park resources or values, just as a "major" impact is required before NPS will determine an impact is significant under NEPA. See Defs.' Mem. at 35 n.13. Where it has defined "major," NPS states that the impact must be one of "substantial consequences on a regional scale for long periods of time," or "severely adverse for long periods of time." See Union Gas EA at 41, 50 (AR-U 0464, 0474). NPS should explain whether it has, in fact, dismissed all short-term impacts -- those lasting as long as three years -- as a basis for "impairment," and its rationale for doing so. Additionally, the "severely adverse" threshold does not have a readily apparent basis in section 1 of the Organic Act, or in NPS's interpretation of that statute as set forth in the EAs, and hence requires further explanation.

III.    NEPA

    A.    Applicability of NEPA to Exemption Determinations under 36 C.F.R. § 9.32(e)

        Defendants contend that NEPA does not require NPS to consider impacts caused by

activities outside the Preserve because, pursuant to 36 C.F.R. 9.32(e), "NPS has no authority to

regulate surface operations outside park boundaries or otherwise prevent their impacts," and thus

NPS cannot be considered a "cause" of those impacts.  Defs.' Mem. at 41.  Defendants contend

that Public Citizen v. Dep't of Transp., 541 U.S. 752, 767-70 (2004), holds that where an agency

has no authority to prevent the environmental impact, NEPA does not require an environmental

assessment to consider those impacts in determining whether an agency action is a "major

Federal action" requiring an EIS under NEPA.  Plaintiffs respond that Public Citizen does not

apply here because, unlike the situation in Public Citizen, NPS has the ability under the Organic

Act -- although not under the 9B regulations -- to prevent the activities causing the environmental

impact by denying access to the Preserve.  Pls.' Reply Mem. at 33-34.  The Court agrees that the

authority of NPS to regulate access to parks under the Organic Act puts the agency in a markedly

different position than agencies who are not required to prepare an EA under NEPA because of a

lack of authority to take any action affecting environmental impacts.

        Public Citizen involved circumstances where the agency clearly had "no ability" to take

actions that could lessen the environmental impacts of concern to the plaintiffs.  541 U.S. at 766.

There, the Supreme Court addressed whether the Federal Motor Carrier Safety Administration

("FMCSA") was required to prepare an environmental assessment evaluating environmental

impacts caused by Mexican trucks that would soon be allowed to enter the United States.  Id. at

762-64.  Congress had enacted a two-year moratorium prohibiting Mexican motor carriers from

obtaining certifications to operate within the United States, and had authorized the President to

extend the moratorium, as well as to lift it if he determined that doing so was in the national

interest.  Id. at 759.  The President announced his intention to lift the moratorium in 2001.  Id. at

760.  Congress then enacted legislation prohibiting the expenditure of certain federal funds to

process Mexican motor carrier applications until FMCSA had promulgated rules governing

safety-monitoring of Mexican carriers and applications for permission to enter and operate.  Id. at

760-61.  FMCSA's EA for the proposed rules did not consider any environmental impact (i.e., air

pollution) that might be caused by the increased presence of Mexican trucks within the United

States because the entry of Mexican trucks was not an "effect" of its regulations, but rather was

caused by the President's decision to lift the moratorium.  Id. at 761.  Environmental group

plaintiffs contended that the agency was required to consider the environmental impacts from

increased cross-border operations of Mexican trucks.  Id. at 765.

The Supreme Court rejected that argument, holding that "where an agency has no ability

to prevent a certain effect due to its limited statutory authority over the relevant actions, the

agency cannot be considered a legally relevant 'cause' of the effect. Hence, under NEPA and the

implementing CEQ regulations, the agency need not consider these effects in its EA when

determining whether its action is a 'major Federal action.'" Id. at 770 (emphasis added).

The Court explained that, because NEPA and its implementing regulations define a "major

Federal action" in terms of its "effects," which are in turn defined as "direct effects which are

caused by the action" and "indirect effects which are caused by the action," the relevant question

was whether the increase in Mexican trucks in the United States (with the correlative release of

emissions) was an "effect" of FMCSA's rules.  Id. at 763-64.

In determining that there was no causal link, the Court stressed that "a critical feature" to

its decision was that the agency had "no ability to countermand the President's lifting of the

moratorium or otherwise categorically to exclude Mexican motor carriers from operating within the United States." Id. at 766 (emphasis added). The Court also noted that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause," and thus but-for causation is insufficient. Id. at 767.  In determining whether an EA or EIS is required, another factor is whether the preparation of an EIS or EA would be useful to the decisionmaking process in light of NEPA's regulatory scheme, applying a "rule of reason." Id. at 767-68

Applying those standards to NPS and the decisions here, it is readily apparent that, to determine whether NPS action on an application to drill beneath the Preserve pursuant to a section 9.32(e) exemption is a major federal action under NEPA, one must evaluate impacts from the surface activities of the directional drilling.  The holding in Public Citizen extends only to those situations where an agency has "no ability" because of lack of "statutory authority" to address the impact.  NPS, in contrast, is only constrained by its own regulation from considering impacts on the Preserve from adjacent surface activities.  Indeed, NPS has the ability -- which it has exercised -- to consider the impacts from surface activities in making the impairment determination pursuant to section 1 of the Organic Act in connection with the exemption decision.  If an operator qualified for an exemption under section 9.32(e), but NPS determined that adjacent surface activities would impair park resources and values under the Organic Act, the Act would leave NPS no choice but to withhold the exemption until NPS had addressed the threat of impairment in some other manner.

Put another way, under a "rule of reason" (Public Citizen, 541 U.S. at 767), it makes sense for NPS to assess the impacts from surface activities because there is a reasonably close causal relationship between such impacts and NPS's decision to grant an operator access to oil

and gas beneath the Preserve pursuant to an exemption from the 9B regulations.  The surface

drilling activities are functionally inseparable from the downhole drilling activities, which may

not take place until NPS grants the operator access through the Preserve, either pursuant to a 9B

plan of operations or by an exemption from that requirement under section 9.32(e).

In addition, the EA information on impacts from adjacent surface activities is "useful" to

NPS in its decisionmaking process -- another indicia of whether NEPA analysis is required.  NPS

concedes that if an EA/EIS showed that adjacent surface activities would impair Park resources,

it "could seek congressional aid in the form of a buyout of the private mineral interests or it could

seek some other legislative solution."  Defs.' Reply Mem. at 13 n.5.  Although defendants do not

acknowledge it, NPS also could initiate a regulatory solution pursuant to its authority under

either the Organic Act, 16 U.S.C. §§ 1 and 3, or the Big Thicket National Preserve enabling

legislation, 16 U.S.C. § 698c.[28]   The Court concludes, therefore, that NEPA requires NPS to

evaluate impacts on the Preserve from adjacent surface drilling activities when determining

whether NPS action on a directional drilling application pursuant to section 9.32(e) is a major

federal action.  The Court now turns to review of the merits of plaintiffs' claim that NPS's three

FONSIs were arbitrary and capricious.

### B.    Judicial Review of Environmental Assessments and FONSIs under the APA

Like other agency actions reviewed under the APA, a deferential standard of review

applies to the NPS environmental decisions reflected in the three FONSIs, and the decisions may

---

[28]   Under 16 U.S.C. § 3, the Secretary has the authority to promulgate "such rules and regulations as he may deem necessary or proper for the use and management of the parks . . . under the jurisdiction of the National Park Service."  Under 16 U.S.C. § 698c, the Secretary has the authority to promulgate "such rules and regulations . . . as he deems necessary and appropriate to limit and control the use of, and activities on, Federal lands and waters with respect to: . . . (2) exploration for, and extraction of, oil, gas, and other minerals."

be overturned only if arbitrary and capricious or an abuse of discretion. <u>Southern Utah</u>

<u>Wilderness Alliance v. Norton</u>, 326 F. Supp. 2d 102, 118 (D.D.C. 2004).  In reviewing an

agency's finding of no significant impact, a court must consider whether the agency has satisfied

four requirements:

> First, the agency [must have] accurately identified the relevant environmental concern.
> Second, once the agency has identified the problem it must have taken a 'hard look' at the
> problem in preparing the EA. Third, if a finding of no significant impact is made, the
> agency must be able to make a convincing case for its finding. Last, if the agency does
> find an impact of true significance, preparation of an EIS can be avoided only if the
> agency finds that the changes or safeguards in the project sufficiently reduce the impact to
> a minimum.

<u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339, 340-41 (D.C. Cir. 2002), <u>quoted in</u> <u>Town of Cave</u>

<u>Creek, Arizona v. FAA</u>, 325 F.3d 320, 327 (D.C. Cir. 2003).

Plaintiffs contend that NPS has failed to take a "hard look" at the impacts from surface

activities occurring outside the Preserve and that it has not made a convincing case for its

findings.  Pls.' Mem. at 32-37.  Plaintiffs assert that NPS instead followed a "general" look

approach, under which, according to plaintiffs, NPS "glossed over" impacts that it did identify

without any substantive analysis.  Plaintiffs cite, by way of example, certain impacts on visitors

to the Preserve, the risk of catastrophic events such as fires and spills, and impacts on water

resources and air quality.  Defendants respond that the administrative records demonstrate that

each of the concerns raised by plaintiffs was carefully addressed and considered by NPS.

Because NPS's impairment analysis served as its NEPA analysis, the flaws in the

impairment analysis also apply to the environmental assessment.  Those shortcoming are, first,

NPS's lack of explanation as to how it reached its conclusions, typically simply describing the

impact followed by a conclusion that the impact was not an impairment or, in the case of NEPA,

that it was not "significant"; and second, the use of the descriptors "negligible," "minor,"

"moderate," and major" that are largely undefined or are defined in a manner that includes few objective bounds.  See supra 37-43.  As plaintiffs note, NPS acknowledged that there could be "negligible to moderate" impacts on the natural soundscapes, lightscapes and water resources, but nowhere explained the basis for its conclusion that potentially "moderate" impacts could not be significant under NEPA.  See Pls.' Mem. at 34 n.16.  There is no basis in the administrative record for accepting NPS's conclusion that even a "minor" impact is not significant under NEPA, because there are no determinate criteria offered for distinguishing a "minor" impact from a "moderate" or "major" impact other than NPS's conclusory say-so.

The flawed nature of NPS's "general" (as opposed to "hard") look is underscored by NPS's own characterization of its approach.  In the Collins and Black Stone EAs, NPS expressly stated in the scoping process-- the threshold step for determining whether impacts would be "carried forward" to a more detailed look -- that "[t]he impacts of these connected actions will be described in a general sense in this EA.").  Collins EA at 8 (AR-C 0470) (emphasis added); Black Stone EA at 9 (AR-B 0212) (same).  Furthermore, it dismissed all impacts except for soundscape and "impacts on adjacent landowners, resources and uses" from the more fulsome impairment determination (which also doubled as the NEPA analysis).  Although scoping is authorized by the NEPA regulations, the scoping regulations still require the agency to explain "why they [the dismissed issues] will not have a significant effect on the human environment." 40 C.F.R. § 1501.7(a)(3).

NPS also has barely responded to plaintiffs' contention that NPS failed to consider the cumulative impacts of eleven other wells that operators have been authorized to drill from surface locations outside of the Gore Baygall Unit to downhole targets within the Unit, and three active wells within that Unit.  See Pls.' Mem. at 36-37 & n.13; Tr. at 44; see also Union Gas EA

at 19 (AR-U 442).  An assessment of "cumulative impacts" is required in the determination of

whether a proposed action is "significant."  See Grand Canyon Trust, 290 F.3d at 341 (explaining

that "significance" is defined to include "individually insignificant but cumulatively significant

impacts," and "cumulative impact is, in turn, defined as encompassing 'the incremental impact of

the action when added to other past, present, and reasonably foreseeable future actions,

regardless of what agency . . . or person undertakes such other actions'") (quoting 40 C.F.R. §§

1508.7, 1508.27(b)(7)).  Thus, the EA must provide "a realistic evaluation of the total impacts

and cannot isolate a proposed project, viewing it in a vacuum."  Id. at 342.

But virtually no cumulative impacts assessment including the other directional wells

outside of the Gore Baygall Unit has been done here.  All that is offered about these wells is a

brief reference to their authorization and existence in a section evaluating socioeconomic impacts

(Union Gas EA at 19 (AR-U 442)), and a general acknowledgment of impacts from "existing oil

and gas operations" in the cumulative impacts paragraph for each impact topic analyzed in the

EA.  See, e.g., Union Gas EA at 48 (AR-U 0471) ("Noise sources would include existing and

future oil and gas operations in and outside the Unit, routine park maintenance operations,

recreational activities . . . , and forestry operations . . . , which would result in localized, short- to

long-term, negligible to moderate, adverse cumulative impacts to natural soundscapes."); id. at

57 (AR-U 0480) ("The existing and reasonably foreseeable activities, including vehicle use,

recreational activities . . . , development (including oil and gas activity), and commercial timber

activities, would contribute short- to long-term, localized to widespread, negligible to moderate,

adverse cumulative impacts on water resources, floodplains, and wetlands.").

This is not to say that NPS has not responded with specificity to some of plaintiffs'

allegations of inadequate analysis.  For example, plaintiffs assert that NPS failed to consider

hydrogen sulfide as a pollutant.  However, NPS provided a detailed response in the

administrative decision, explaining that the operator "anticipate[s] that there will be 15 parts per

million [ppm] $H_2S$ in the Woodbine Formation," which would not pose a health or safety risk

because it is well below the 100 ppm threshold set by the Texas rule as warranting regulation.

Collins FONSI at 14 (AR-C 0016).  In contrast, NPS only responds to concerns about

catastrophic events -- fires, spills, and blowouts --with conclusory statements that the probability

of such events is "low" or "very low" because of preventive measures in place to control such

events.  AR-C 1066; AR-B 0516.  There is no data in the administrative records to give meaning

to "low" or "very low" -- only the post hoc declaration of Mr. O'Dell that, although subject to

judicial consideration for the standing inquiry, is not available for consideration of the APA

record review claims.  See Cone v. Caldera, 223 F.3d 789, 795 (D.C. Cir. 2000) (rejecting

affidavits submitted after the close of administrative proceedings to explain agency action); see

also Camp v. Pitts, 411 U.S. at 142.  NPS's explanation as to why it concluded that the impact on

the visitor experience was not significant also has large gaps.  NPS reasoned that developed

visitor use areas were three quarters of a mile from the Collins site (AR-C 0459) and one and a

quarter mile from the Black Stone D1 site (AR-B 0235), in areas it considered remote, making

visitor use unlikely.  But commenters stated they hiked in those areas (AR-C 0225), and NPS's

explanation clearly did not account for hikers.  Moreover, NPS did not invoke the rationale

regarding lack of visitor centers for the Union Gas wells, summarily dismissing the impacts on

visitors based on "the low intensity of impacts to the other resources and values."  Union Gas EA

at 23-24 (AR-U 446-47).

    In short, NPS's three findings of no significant impact are, the Court concludes, arbitrary

and capricious for many of the same reasons as are the impairment determinations.  In each

decision, NPS has failed to take a "hard look" at impacts on the Preserve from adjacent surface activities, as evidenced by the lack of explanations supporting its conclusions and, in particular, its methodology of describing impacts using conclusory labels and then setting forth a bare conclusion without explanation as to the significance of an impact. NPS also failed to provide an adequate cumulative impacts analysis that included the other oil and gas operations in the Gore Baygall Unit.  On remand, then, NPS must prepare a new environmental assessment for the Collins, Black Stone, and Union Gas sites that fills in these gaps.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment, and grants in part and denies in part plaintiffs' motion for summary judgment.  The administrative records demonstrate that, contrary to plaintiffs' assertions, for each of the three challenged decisions NPS did consider impacts on the Big Thicket National Preserve from surface drilling activities outside the Preserve pursuant to its obligations under the Organic Act and NEPA.  However, NPS's ultimate conclusions that the drilling activities would not result in impairment of park resources and values under the Organic Act, or a significant impact on the human environment under NEPA, are not supported by reasoned explanations, and hence are arbitrary and capricious and an abuse of discretion.  The case will be remanded to the National Park Service for further proceedings consistent with this Memorandum Opinion on the applications to drill the still-viable Collins, Black Stone, and Union Gas wells pursuant to an exemption under 36 C.F.R. § 9.32(e).  A separate order will be issued herewith.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:   October 25, 2006